Clarke *v.* City of Rochester.

---

## CLARKE *vs.* THE CITY OF ROCHESTER.

All the inherent power of the people for self-government, not delegated to the general government, is reserved to, and belongs to, the state.

Of such reserved powers the entire legislative power is vested in the state legislature, subject to no restrictions or limitations except such as are contained in the state constitution.

The taxing power belongs to the legislature, and is subject to no limits or restrictions outside of the United States and state constitutions.

The power to authorize the construction of works of internal improvement, and to provide for their construction by the officers or agents of the state, rests with, and pertains to, the legislature, to be exercised within its exclusive jurisdiction.

Clarke *v.* City of Rochester.

Such works may be constructed by general taxation, and in case of local works, by local taxation; or the state may aid in their construction by becoming a stockholder in private corporations; or authorize municipal corporations to become such stockholders for that purpose.

Rail roads are public works, and may be constructed by the state, or by corporations, and lands taken for their use are taken for the *public use,* and may be so taken, on payment of a just compensation.

The legislature is the exclusive judge in respect to what works are for the public benefit, and in regard to the expediency of constructing such works, and as to the mode of their construction, whether by the state or by private or municipal corporations in whole or in part.

The legislature may authorize municipal corporations to subscribe to the stock of a rail road company, with the consent and approval of a majority of the corporators, duly ascertained.

The passage of a law authorizing such subscriptions to the stock of a private corporation, subject to the assent or approval of a municipal corporation, by the vote of the corporators, is not a delegation of power to the corporation to pass a law, but is a legitimate case of conditional legislation, and is entirely within the discretion of the legislature.

The act to amend the charter of the city of Rochester, passed July 5, 1851, including the sections 285 to 291 inclusive, was a valid law immediately upon its passage and the signature of the governor thereto; and the provision therein that those sections should not take effect until approved by the corporation, merely suspended the power of the common council to act upon said sections until such approval. JOHNSON, J. dissented.

The acts of the city of Rochester, in subscribing for the stock of the Genesee Valley Rail Road Company, and in issuing the bonds of the city to pay for such stock, were legal and valid acts; and the city were entitled to take and hold such stock, or to sell it to individuals as valid stock, and is bound to pay the bonds so issued. And a purchaser of such stock cannot have his contract of purchase rescinded, on the ground of its invalidity.

APPEAL from a judgment entered at a special term, after a trial at the circuit, before his honor, WM. F. ALLEN, one of the justices of this court, without a jury. The facts are fully set forth in the opinions which follow.

*E. Griffin,* for the appellant. There is no dispute about the facts of this case. It is not pretended that the city of Rochester has done any thing more than the legislature ·intended to authorize. The only question presented on the trial of this cause, by the plaintiff's counsel was, whether the legislature had the right to delegate to the citizens of Rochester, as they

have done, in section 209, the power to accept or reject the provisions in the previous sections of the act. It was contended at the circuit that this delegation of power to the electors of Rochester, was unconstitutional, and the case of *Barto* v. *Himrod*, was cited. No question whatever was made by the plaintiff's counsel as to the power of the legislature to authorize the city to subscribe for the stock, and issue their bonds. It was merely contended that they had not done so. The question as or the general power of the legislature was never raised or discussed in the court below. The court, however, did decide against us upon that point, as well as the one raised on the argument. It will, therefore, be our endeavor to show that the court below was mistaken upon all the grounds upon which the decision is based. 1st. It is contended on our part, that the legislature had full power to authorize the city of Rochester, by their common council, to subscribe for 3000 shares of the capital stock of the Rochester and Genesee Valley Rail Road, and issue their bonds to pay for the same. 2d. That the legislature, by the act passed July, 3, 1851, amending the charter of the city, have conferred this power.

The determination of this cause requires the deliberate and careful examination of the powers of the legislative and judicial departments of our government. In this country, government is divided into three departments—legislative, judicial and executive. The legislature to pass laws, the judicial to construe them, and the executive to see that they are enforced. These departments are created entirely distinct, by the constitution, and the public good requires that they should be rigidly kept so. The constitution being the supreme law of the land, the judicial department is necessarily empowered to construe it. A laudable desire to protect the citizen from the exercise of what the judges may consider a dangerous power conferred by the legislative department, has in some instances induced courts, by construction, to trench upon the powers of this department. That cities and towns have suffered from the exercise of such powers as are conferred upon the city of Rochester, must be admitted ; and such considerations are apt

Clarke *v.* City of Rochester.

to have their influence upon the decisions of courts, in all such cases. A general sentiment pervades the community, that it is unwise and inexpedient to confer upon municipal corporations the power to engage in the construction of rail roads. This sentiment may be just, but the court will bear in mind, that the wisdom or expediency of a law is left solely and exclusively with the legislative department of our government. No other department has a right to interfere with the exercise of the power to pass laws. If the legislature pass a law, no other department can gainsay or deny its wisdom or expediency ; as long as the law remains in force, it is wise and expedient. Every law passed by the legislative department is presumed to be constitutional; and all courts are bound to approach the examination of every question involving the constitutionality of a law, under the influence of such a presumption. (1 *M'Cook's Ohio Rep. N. S.* 82.) It should be the wish and anxious desire of all courts, to uphold and sustain the authority of the legislative department. A decent respect for the opinions of so numerous and intelligent a body of men as our legislature, would induce such a desire. The ruinous consequences to result from pronouncing the law unconstitutional, should have controlling influence with all courts, where there is any doubt or hesitation.

The rule which we contend for is this : That no law should be declared unconstitutional, unless the court, starting with the presumption that it is constitutional, should become satisfied, *beyond any doubt or hesitation, that* it was *clearly, plainly and palpably unconstitutional.* We contend that this is the only reasonable and safe rule, and that it is supported by the decisions of every respectable tribunal in this country which has ever pronounced an opinion upon the subject. (6 *Cranch,* 87, 128. 4 *Dallas,* 14. 3 *Ser. & R.* 178. 12 *id.* 339. 4 *Binney,* 123. 4 *Wheat.* 518. 1 *Cowen,* 550. *U. S. Dig. vol.* 1, 553, *and cases cited.* 1 *M'Cook's Ohio Rep. N. S.* 82.) We say that the legislature, when acting within the scope of the legislative department, can rightfully pass any law not expressly prohibited; and we might safely rest this decision

upon the inability of our opponents to produce any such pro-hibition. If the framers of the constitution mean to restrain the legislature in the exercise of any particular power, they would plainly say so. They would leave no doubt on the sub-ject. This prohibition is not to be made out by a process of reasoning, but by putting your finger upon the prohibition itself. (*Leiber on Civil Gov. ch.* 15, § 25. 2 *Barr,* 285. 2 *Rawle,* 374. 1 *Jones,* 61. *Hartman* v. *Commonwealth,* 5 *Harris.*) With all due deference to the course pursued by the ingenious and able judge who presided at the circuit, and pronounced the law under which the defendants have acted, unconstitutional, I submit, that he has departed from the well established rule, laid down by the sages of the law who have preceded him, and practically said that any law is unconstitu-tional which can by a process of reasoning be made plausibly to appear so. He has practically repudiated the plain, safe and well established rule, and adopted one eminently unsound in principle and unsafe in practice. Is the rule thus practi-cally adopted by his honor, in this case, a safe rule, in the con-struction of constitutional powers? We think not, and trust that your honors, when you reflect upon the dangers which will result from the adoption of such a delusive standard or rule, if it can be called a standard or rule, will concur with us in this opinion. What then are the powers of the legislative depart-ment of our state government? We contend that the legisla-ture of this state has a right to pass all laws not specifically prohibited by the constitution of this state, or of the United States. It has been said that the British parliament is om-nipotent. It is omnipotent in this sense: it possesses the su-nreme sovereign power of the state, or a power of action pncontrolled by any superior. The powers of government were, by the revolution, devolved upon the people of this state or col-ony. By that event the whole power of legislation, or the same power as the British parliament possessed, was devolved upon us. (1 *Bald.* 224. 8 *Wheat.* 584. 2 *Peters,* 656.) Our state constitution does not define the powers of the legislature. It merely created the legislative department. To enumerate and

define the powers of our legislature, would have been impracticable. If we would learn the extent of those powers, we must consult treatises on the subject of political science. (*Leiber on Civil Gov. ch.* 15, § 25.) The power to make laws resided, originally, with the people. By the adoption of the federal constitution, the people of this state parted with some of those powers. By the adoption of the state constitution they delegated the power to make laws to a senate and assembly, with certain limitations and restrictions. The second grantee, (if I may so express it,) would possess all the remaining power of the people upon such terms as they thought proper to grant it. These limitations and restrictions are to be construed strictly, and a liberal construction is to be adopted in regard to the powers claimed as granted by the state constitution, to the state legislature. The state stands upon the general grant. The rule is different when applied to the general government. The rule there is, that the constitution is to be construed strictly ; for the obvious reason, that there is no general grant. They possess enumerated powers. They stand upon the enumeration. Deducting, therefore, the powers delegated to the general government, and the limitations specifically imposed by our state constitution, the legislature possess the same extent of powers as the British parliament, or any other legislative department in the civilized world. (21 *Wend.* 576. 1 *Hill,* 329. *Opinion of Judge Washington, in Golden* v. *Rice,* 3 *W. C. C. R.* 1 *Bald.* 74.) With these deductions, they are omnipotent in the same sense as the British parliament is omnipotent. They possess the sovereign power of the state, without control. When the people authorize any body of men to make laws, that body stands in the place of the people, and are supreme because the people are so. The question then is, does the constitution of the United States, or of the state of New York, forbid the legislature of this state to authorize the city of Rochester to subscribe for this stock, and issue its bonds to pay for it ? There is no pretense that any thing in the constitution of the United States prohibits it. Government exercises power over the property of the citizen in two ways—by

taxation, and by taking the property of the citizen for public use, upon making a just compensation. In no other way can government lawfully touch it. The power to contract this debt, if upheld at all, must be under the taxing power. The right of eminent domain has clearly nothing to do with the case. Taxing property is not taking it for public use. The property taxed remains the property of the owner, subject to the burden imposed by the tax. (3 *Com.* 419.) 1. We will consider whether the legislature are restricted by any thing in the constitution, from granting the power to the city of Rochester, to subscribe for this stock, and issue their bonds. 2. Whether the use to which the money was to be applied, was a public use or purpose.

I. Section 9, article 7, of the state constitution, is as follows: " *The credit of the state shall not, in any manner, be given or loaned to, or in aid of any individual association or corporation.*" This provision does not prohibit the state from building a rail road, or subscribing for its stock, if the legislature should think that the public interest would be promoted thereby. The provision is plain, and merely extends to the *loaning of the credit of the state. The aid prohibited* is the *loaning or giving the credit of the state.* If the framers of the constitution meant to prohibit the building of rail roads, or subscribing for stock, they would have said so. They well knew that the state had suffered by the loaning of its credit to rail roads, and the provision was intended to guard against such consequences in future. Section 10 authorizes the state to borrow money to meet casual deficits, to the amount of one million. Section 11 authorizes the raising of money to repel invasions, suppress insurrections, and defend the state in war. Section 12 authorizes the contracting of any debt by a law, for any single work or object, to be distinctly specified therein. Such law shall also provide, by tax, for the payment of interest, and also the principal in 18 years. But no such law shall take effect until submitted to the people at a general election, and approved by a majority of their votes. These are all the provisions in the constitution limiting the power of the state legislature in rais-

ing money. These provisions are intended to restrict the power of the legislature in raising money for the state itself, having nothing to do, as I apprehend, with the right of the state, by legislative enactments, to enlarge the powers of municipal corporations. That the legislature has the right to authorize municipal corporations to raise money for certain purposes cannot be denied. Our statute books are full of this class of laws. They have lately authorized the city of Rochester to issue their bonds and raise money by their sale, for the construction of bridges over the Genesee river. It is quite obvious that these provisions of the constitution were never intended to apply to municipal corporations. The whole scope and object of these sections, and the express language used, clearly forbid any such idea. They *clearly, plainly and palpably, without any doubt or hesitation,* are limitations of the power of the state, when raising money for the state itself. How these provisions can be used as they have been, by his honor, the circuit judge, to sustain the idea that the legislature had not the power to pass the act under which the city of Rochester has issued its bonds, and subscribed for this stock, is beyond my comprehension. But the 9th section of the 8th article of the constitution contains the following: "It shall be the duty of the legislature to provide for the organization of cities, and incorporate villages, and restrict their powers of taxation, assessment, borrowing money, contracting debts and loaning their credits, so as to prevent abuses in assessments, and in contracting debts by such municipal corporations." This is, as we suppose, the only provision in the constitution at all applicable to municipal corporations, or which at all affects the question now before this court. His honor, the circuit judge, considers this a constitutional prohibition. We regard it in quite a different light. We suppose that this provision was placed in the constitution, by its framers, with full knowledge that the legislature then possessed, and would continue to possess and exercise, the power of authorizing municipal corporations to contract debts and borrow money for any public use, and for the sole purpose of having guards against abuse provided, when they did grant the power.

Until 1853, the legislature passed no general law in obedience to this provision. Up to that time they acted upon each particular case as it arose. When any municipal corporation applied to raise money, or loan their credit, the legislature granted the application with such guards against abuse as they thought proper. They usually provided that the question of raising the sum fixed by them, should be submitted to the taxable inhabitants of the locality to be affected by the debt, and if two-thirds voted in favor of the law, the money was raised, otherwise not. The legislature, also, in all such cases, were careful to provide that the money thus raised should be applied to a specific purpose, and no other; and until wanted for that purpose that it might be loaned in a particular manner. During the years 1850, 1851, 1852 and 1853, there are numerous instances where the legislature authorized municipal corporations to raise money to be invested in the building of rail roads. Albany, Buffalo, Rochester, Oswego, Elmira, Poughkeepsie and many other cities and towns, were thus empowered to raise money. In all cases, the legislature provided, in case of a sale of the stock subscribed for, that the proceeds should be applied to the payment of the bonds. In these various ways the legislature, in compliance with this constitutional provision, intended to guard against abuse. In our case the legislature provided that the money which should be raised by a sale of the bonds should be invested in the stock of the Rochester and Genesee Valley Rail Road, "and employed and used in the construction of said road, and for no other purpose whatever." The city was bound to take 3000 shares of this stock, and see that the money paid for it was applied to the construction of the road, and for no other purpose. The legislature use the words *subscribe or purchase*, as equivalent terms. It is difficult to see how the city could comply with the requirements of the act in having the money applied to the construction of the road, without subscribing for the stock, or purchasing it of the company. It is obvious that it was never the intention of the city to become a speculator in stocks. When the constitution imposes upon the legislature a duty, without specifying the manner of per-

forming it, is not the mode and manner of doing it left exclusively with that body? The framers of the constitution knew that the wants of municipal corporations could not be foreseen or defined, and that, of necessity, the supply for those wants must be left with the legislature; and they therefore contented themselves with enjoining upon the legislature, in case they granted the power to raise money, to guard against abuse. Does this provision, contained in the constitution, as the circuit judge supposes, prohibit the legislature from giving power to the city of Rochester to subscribe for this stock and issue its bonds? Most certainly not? It contemplates that the legislature may grant such power, else why are they enjoined to guard against abuse in its exercise? Can there be any thing *more clear, plain, palpable, and beyond doubt or hesitation,* than this: That the framers of the constitution intended to leave to the discretion of the legislature the power to authorize municipal corporations to contract debts and raise money, with such guards against abuse as they thought proper? On the 21st of July, 1853, the legislature passed an act entitled " An act to *restrict and regulate* the power of municipal corporations to borrow money, contract debts and loan its credit." By this general law the legislature undoubtedly intended to comply with the constitutional provisions contained in the 9th section and 8th article. Instead of performing the duty as they had before done, for their own convenience they thought proper to pass a general law. This general law is an act to *restrict* and *regulate* the power of municipal corporations in borrowing money, contracting debts and loaning their credit. *Not to prohibit.* The legislature certainly did not suppose that they were, by this provision contained in the constitution, prohibited from granting power to municipal corporations for these objects.

Section 1 prohibits municipal corporations from giving or loaning their credit to, or in aid of any individual association, or corporation—using precisely the language of the constitution, in section 9, article 7. This section does not forbid subscriptions for stock, and if it did, could not operate upon previous grants of power. The section and act, although passed in obe-

dience to the constitutional requirement, does not possess the force of a constitutional provision. Any subsequent grant of power to do the thing prohibited, would necessarily operate as a repeal of this law. The subsequent provisions of this act fix the amount which can be raised by any municipal corporations, according to the valuation of the assessed property, not exceeding eight per cent thereon. The act further points out the manner of raising this money. In the judgment of the circuit judge, all these legislators, who have thus concurred in this long series of legislation, under this provision in the constitution, were entirely mistaken in its meaning.

We submit that there is no provision in the constitution prohibiting the legislature from granting to the city of Rochester, the power to subscribe for this stock, and issue their bonds for its payment. 1st. Not in the 7th article, because the sections have no application whatever to municipal corporations, but are solely applicable to the powers of the legislature when raising money for the use of the *state itself*. 2d. Not in the 9th section of the 8th article, because that is not a constitutional prohibition of the power, but a mere direction to the legislature to restrict and regulate the exercise of the power when granted, so as to prevent abuse.

II. The use or purpose to which the money was to be applied, was a public use or purpose. We admit that the legislature could not authorize the city of Rochester to issue its bonds, and raise money, to invest in manufacturing business, or any business of a private nature; and, his honor, the circuit judge, considers the building of rail roads a private business. Here we differ, and this is probably the turning point in this case. It is no part of the business of the legislature of this state to engage in private business, or to authorize any municipal corporation so to engage. It not being within the scope of the legislative department, no constitutional restriction was necessary. Government is instituted to carry on, and attend to, public business— not private. But the legislature, unless expressly restrained by the constitution, possess the power of taxing the property of the citizen, to any extent, for the purpose of engaging in the

Clarke *v.* City of Rochester.

construction of any works of public utility, or aiding individuals in the construction of any such works. (4 *Wheat.* 316.) Having a right to do the whole work, they may do, of course, a part, and in any way or manner which they think best. This power of taxation, they may transfer to a municipal corporation, for a similar purpose. All municipal corporations are created in the place of the state government, because they can more conveniently, and more judiciously legislate for the inhabitants of a particular locality, than the state legislature itself. We insist that all tax laws must be considered valid, unless they are for purposes in which the community taxed have palpably no interest; when it is apparent that the burden is imposed for the benefit of others, and where it will be pronounced so at first blush. (9 *B. Monroe,* 345.) It is a mistake to suppose that government was instituted for the sole purpose of keeping the peace, and securing life, liberty and property. It has other duties to perform, such as the establishment of schools and colleges, thereby diffusing the blessings of knowledge. So far has our state gone, and rightfully gone too, as to tax the whole community to pay the expenses of education itself. The citizens of Rochester are taxed about $50,000 annually for this purpose. It is also an ordinary exercise of the taxing power, by our state, to stimulate and increase trade and commerce, by the construction of roads, bridges, rail roads and canals, at the public expense. A rail road, although undertaken and constructed by a private corporation, is yet a public work or improvement. It is as much or more so, than a common highway or turnpike. *The ultimate use and benefit to the public, is the test, not whether the work is done by a private company.* The government may, and ordinarily does employ private agency in the construction of public works. They may associate and co-operate with private corporations, or individuals, in the construction of a public work. Having the *power to do the work,* government is the sole judge of the manner of doing it. Is not the public welfare and prosperity of the state promoted and greatly promoted by the construction of rail roads? Is not the public greatly benefited by the cheap and rapid transportation of passengers and property

on them? Is not the value of all articles sent to market enhanced thereby? Have they not opened new markets for many articles, before unsalable? Have they not greatly raised the value of land itself in all rural districts? Have they not increased the business in all places where they terminate and center? Have they not raised the price of land in all such localities? Is not Chicago, that inland wonder, indebted largely to rail roads for its rapid increase and prosperity? Is not Rochester itself benefited in a similar manner, and would not the sensible owners of real estate, in this city, willingly pay $300,000 rather than lose the benefits derived, and expected to be derived from the Valley Road? Judge Sutherland, in *Bloodgood* v. *The Mohawk and Hudson Rail Road*, says: "Rail roads, though made by private corporations, when designed for traveling and transportation, are great public improvements. They can be made profitable to the corporators only by affording the most liberal accommodations to *the public*. They are from their very nature devoted and exclusively devoted to *the public use*, upon such terms and conditions as the legislature, in their wisdom, think reasonable and proper, in order to insure the owners of the stock an adequate remuneration for the hazard and expense incurred in their construction." (14 *Wend.* 57. 3 *Paige*, 45, 73, 74. 9 *Harris*, 169, 170. 1 *Bald.* 223. 2 *Peters*, 253. 1 *McCook*, 94, 5.) The same language is used by the chancellor in his elaborate and able opinion in the case, (3 *Paige*, 71.) The general rail road act declares all land taken by private corporations for the use of a rail road, taken for public use. Canals, bridges, roads, and other artificial means of communication have been made by the sovereign power at the public expense, in every civilized nation, in ancient and modern times, and we deem it quite unnecessary to cite authorities in support of the practice. Is his honor right, then, when he classes rail roads with manufacturing and mercantile business of a private nature? Is there no difference between them? We think there is, and that we have established, both from reason and authority, that rail roads are great public works or improvements, in which the state or municipal incorporation may engage at the public expense.

III. The legislature, by the passage of the act of July 3, 1851, amending the charter of the city of Rochester, has fully conferred upon the city the power to subscribe for this stock, and issue their bonds to pay for the same, provided two-thirds of the electors voted for it. We contend that this is the passage of an act *in presenti* to take effect *in futuro*, upon a contingency, to wit: the vote of two-thirds of the electors of the city accepting the power offered, and that this contingency has happened. This act is similar to many others passed by our state legislature, conferring power on municipal corporations, to raise money to be used in the construction of rail roads and other public works. It is alleged, that our act was never passed; that it was left to the people of Rochester to pass it, and that such delegation of power renders the act unconstitutional. We do not contend that the legislature can surrender any portion of its legislative power, or delegate it. The legislature are made by the constitution the agents of the people, to perform a duty which requires great knowledge and the exercise of much discretion and judgment—according to general principles of law, without any reference to the provisions of the constitution. Such agents cannot delegate their power. The safeguards of the constitution are intended for the protection of the whole people, the minority as well as the majority. If legislative agents can cast off this power and direct others to perform their duty, the protection intended for the people will be gone. *This is plain.* But we hold that it is equally plain, that the legislature, having in due form passed an act with all its provisions, may make that act to take effect upon a contingency, and that this contingency may be fixed in the law itself. All laws range themselves under two heads, viz: those which prohibit or forbid the doing of any act, and those which authorize or permit the doing of an act. Our law belongs to the latter class. In all cases of that kind, it is in the discretion of the person or corporation authorized or permitted to do the act, to decide whether the law shall take effect and become operative. Counties, towns, cities and school districts are authorized by the legislature to raise money for various purposes, provided a

majority of the inhabitants vote to have it done. Until this vote, the laws thus passed do not take effect. They remain dead and lifeless on the statute book. Laws have also been passed, authorizing rail roads to consolidate, upon the vote of the stockholders ; and until this vote was had there could be no consolidation—the act remains inoperative. In our case, no discretion is left with the citizens of Rochester, in regard to the provisions of the law. The manner and amount of subscription is fixed by the law as passed by the legislature. The mode of raising the money, by the issuing of bonds to pay for this stock, is also fixed. The number of directors which the city are to elect is fixed. The manner of using the money raised, by a sale of the bonds, until needed to pay for the stock, is also fixed. The manner of obtaining the assent of the citizens of Rochester to the acceptance of this law, is also fixed. This is all done in the form of an act passed according to the prescribed forms, by the legislature, and this act is declared to take effect immediately. The law is then signed by the governor, and according to the provisions of the constitution then becomes a valid law. The law is thus complete, so far as its passage is concerned, and the discretion, or right to vote, relates only to its execution. It may be used, or carried into execution, or not, as the citizens of Rochester think for their interest. If they choose to carry it into execution, it must be done as it comes from legislative hands. Those who vote are not authorized in any manner to alter this law. Here is no delegation of power to make any law, which means a power to fix its terms, but mere authority to say when a law already made shall be carried into execution. The distinction between power to make a law and the power to say when it shall be carried into execution, is plain and palpable. The power to do the first cannot be delegated to the people at large, but the power to say when such acts as ours shall be executed, must necessarily be left to the body authorized to carry out the act. It is not the vote of the citizens of Rochester that makes or in any manner alters the law, but the law which makes the vote and fixes every thing to be done under it. It is a perversion of

Clarke *v.* City of Rochester.

terms to say, that any act which confers the power of voting is not passed. The law which thus confers the power of voting is said to be passed by the very vote given under the law and in pursuance of it. This seems quite absurd. The vote showed the assent of the citizens of Rochester to the acceptance of the law, and let it be remembered, that the legislature had no power to give this assent. The power to assent rested with us, and how can it be said that the legislature delegated a power which they never possessed? They fixed the manner in which our assent should be given. This they had a right to, and it was all they could lawfully do. The free school act was passed in 1849, and was to go into effect the first of January thereafter, provided a majority of the people voted for it. The tenth section of the act provides, that *the act shall not become a law*, unless the electors, by a majority, vote for it. Here, say the courts, is a clear delegation of power to pass this law; but in our case, the law was complete and perfect, declared to take effect immediately. Certain portions were not to go into operation, except upon a contingency, viz : that two-thirds of the electors should vote to have it. If the legislature had entirely omitted the 291st section, the law would not have gone into operation, except upon a contingency, viz : the vote of the common council; but, would not the law have been passed without such vote? All the legislature have done is to fix upon a different contingency, viz : the vote of the electors. In the case of the free school law, the legislature had a right, (which they subsequently exercised,) to pass a law compelling the state to act under it. Not so in our case : they could merely offer us the power or authorize the citizens of Rochester to subscribe for this stock, and issue these bonds, if they chose. It was not any part of the duty of the legislature to decide for the citizens of Rochester in regard to the acceptance of this offer. All powers granted to municipal corporations are necessarily of the same character, depending upon the voluntary acceptance by the corporation. In this case, the legislature, aware of the constitutional injunction, contained in the 9th section, article 8th, thought proper to guard against abuse, by referring the acceptance to the people. In the case

of *Barto* v. *Himrod*, (4 *Seld.* 490,) Judge Ruggles, says : " *a statute to take effect upon a contingency must be a law in presenti, to take effect in futuro.*" Is not our law, one expressly declared to be a law *in presenti?* Does it not take effect upon a future event? When the legislature fixed that future event, did they exceed their powers? The expediency of exercising the power offered, necessarily in all such cases, rests with the corporation to whom the power is offered. The expediency of offering the power, (being all they can do in such a case,) rests with the legislature. The vote of the electors giving their acceptance, thus provided the occasion, or supplied the contingency, upon which the common council could act. The vote did not pass the law, but furnished the contingency. The legislature are required by the constitution to provide against abuses in raising money by municipal corporations, and will any one say that a reference of the acceptance of such a power to the people, is not a judicious and wise performance of their duty? No legislative power was thus delegated to the citizens of Rochester, and their voting cannot be called legislation. The following authorities, in addition to those cited in *Johnson* v. *Rich*, (9 *Barb.* 680;) namely, *Mooers* v. *The City of Reading*, (9 *Harris*, 188;) *The Cin. Will. and Zanesville Rail Road* v. *The Commissioners of Clinton County*, (1 *McCook*, 77 ;) and *Slack* v. *Maysville and Lexington Rail Road*, (9 *B. Monroe*, 526,) furnish all that can be desired on this question. The case of *Barto* v. *Himrod* is, of course, to be considered the law of the land. It has been pronounced by the supreme judicial power of the state, and I respectfully bow to its mandate. That case, if a delegation at all, was to the whole people, obviously turned upon the express declaration contained in the 10th section, " *that it should not become a law, unless a majority of the people voted for it.*" With all deference, I must say that the reasons given by the judges, who gave the opinions in that case, have failed to carry conviction to my own mind. The free school law, as far as I can perceive, was passed in the usual manner by the senate and assembly, and signed by the governor. All legislative forms were complied with,

Clarke *v.* City of Rochester.

and to call it not a law, passed *in presenti*, to take effect *in futuro*, upon the happening of a contingency, seems to me hardly calling things by their right name. The law certainly gave the vote, and not the vote the law. The vote was the event upon which the law was to become operative, and not the passage of the law. There is no provision in the constitution, prohibiting the legislature from fixing the time, or the event, upon which a law is to take effect, or go into operation; and if we are right in supposing that the legislative power is supreme, except when prohibited, then there can be no good reason for saying that the legislature are at all trammeled in fixing upon the time, or the event. I hold that a law might be made to take effect upon the death of an individual, upon his going to New York; upon the commencement or conclusion of a war; or upon the happening of any other event which the legislature, in their wisdom, may fix upon. Those who think otherwise, in my humble judgment, do not duly appreciate the transcendent powers of the legislative department of our government, or if they do, are unwilling to submit to that power. If the legislature possess the power of fixing the contingeney, their manner of doing it, is left to their own discretion. That discretion cannot be controlled, or in any manner interfered with, by the judicial department.

But there is another view of this case. It will be, of course, conceded that the legislature can delegate the power to make laws to municipal corporations, and if so, why not to the constituents of such corporations? Where is the authority for conferring this power upon the one and not upon the other? The legislature have in many instances conferred the power to raise money, by the vote of the inhabitants of certain localities, as towns and school districts, and how does this differ from the power conferred upon our citizens?

There is another view, also, of this matter. Suppose this delegation to the electors of Rochester to say whether this law which shall go into effect is unconstitutional, then the 291st section is void, and must be stricken out; but the other provisions or sections are perfect, and must remain. It will be recollect-

ed that the 293d section expressly declares that the act shall take effect immediately. By this section, all the valid parts of the act go into effect and become operative. The others being void, of course, must be stricken out. In the case of the prohibitory liquor law, some of the sections were declared unconstitutional, and others good.

*S. Mathews,* for the plaintiff. I. The city of Rochester, in its corporate character, could not lawfully subscribe for, nor take and hold the stock of the Rochester and Genesee Valley Rail Road, which is the subject matter of the contract between the parties. (1.) The act incorporating the city of Rochester confers no such power. (*Laws of* 1850, 501.) No corporation can exercise any powers except such as are expressly granted, and such as shall be necessary to the exercise of the powers so granted. (1 *R. S.* 600, § 3. *See Riley* v. *City of Rochester, Selden's Notes of Cases, Oct.* 1853, *p.* 4.) (2.) The right to take and hold this stock is, however, claimed under the authority of an amendment of the city charter, passed July 3, 1851. (*Laws of* 1851, *p.* 767, § 285 *to* 292.) The plaintiff insists that the authority claimed is not conferred, because there is no evidence that the sections in question ever became a law. A legislative enactment cannot be proved by parol. Besides, there was no law authorizing an election. The section relating to this election had not become a law when the election was held. (2.) The legislature could not confer the authority claimed upon a corporation, incorporated for municipal purposes only. It is not within the scope of legislative power. The legislature could not, either directly or indirectly, impose a tax of $300,000 upon the property of the citizens of Rochester, to be paid to the Genesee Valley Rail Road Company, either in exchange for its stock or otherwise. Such a power would be contrary to the fundamental principles of all free governments. (*See* 1 *Bay,* 93; 7 *John.* 500, *opinion of Kent, Ch. J.;* 9 *B. Monroe,* 345; 3 *Dallas,* 383; *Const. art.* 1, § 6, 7.) (3.) The law is unconstitutional. The law was not constitutionally passed. It was not competent for the legislature to submit the question to the people of Rochester, whether

or not the sections mentioned should become a law. (*Barto* v. *Himrod*, 4 *Selden*, 483. *Rice* v. *Foster*, 4 *Harrington*, 479. *Parker* v. *Commonwealth*, 4 *Barr*, 507.) The act of which the sections are a part, is a private and local law, and embraces more than one subject, and the subjects are not expressed in the title. (*Const. of* 1846, *art.* 3, § 16.) The legislature could not constitutionally enact such a law; such an exercise of legislative power is plainly prohibited by the constitution. (*Id. art.* 8, § 9.)

II. If the law of 1851 is not valid, then the city could not acquire any title to the stock, and could not give to Mr. Clarke any title. The attempt to acquire the stock by the city and to sell it to Mr. Clarke, was illegal. There was not, therefore, any consideration for the agreement to purchase. This case cannot well be distinguished from the case of *Rodman* v. *Munson*, (13 *Barb.* 188,) affirmed in the court of appeals, in *Newell* v. *The People*, (3 *Selden*, 9.)

III. The plaintiff is entitled to recover back the money which he has paid on the contract. (1.) The contract is illegal. The defendant attempted to do an illegal act, in asserting its right to the stock. The city corporation could not deal in stock. The contract was therefore illegal and void, and the money paid upon it may be recovered back. (*See Chitty on Cont.* 636, 7, *and cases cited; and see note* 3, *p.* 622, 3.) (2.) There is a total failure of consideration, and for that reason the money may be recovered back. The city contracted to sell that which turns out to be utterly worthless. In such cases it is the right of the vendee to rescind and to recover back the money paid. (*Young* v. *Cole*, 3 *Bing. N. C.* 724. *Rice* v. *Peet*, 15 *John. Rep.* 503. *Chit. on Cont.* 624.) So long as the contract remains executory, the plaintiff may rescind and recover back the money paid. (*Morgan* v. *Goff*, 4 *Barb.* 524. *White* v. *Franklin Bank*, 22 *Pick.* 181.)

E. DARWIN SMITH, J. This action was brought to recover the sum of $41,740, paid for principal and interest by the plaintiff upon a contract for the sale to him by the defendants of 3000 shares of the stock of the Rochester and Genesee Val-

ley Rail Road Company, issued under and in pursuance of sections 285 to 292, inclusive, of an act to amend the charter of the city of Rochester, passed July 3d, 1851.

The learned judge before whom the cause was tried, without a jury, at the circuit, has found, as a conclusion of law upon the facts stated in the case, that the said sections 285 to 292, inclusive, of the act aforesaid, never became a valid law of the state, and that the subscription to, and the taking of, the said 3000 shares of the stock of the Genesee Valley Rail Road Company, authorized and taken under said sections, were illegal and void; that the several payments made by the plaintiff to the defendants therefor, were made without consideration, and that the plaintiff was entitled to rescind the said contract and require the repayment and recover against the defendants the several sums, with the interest thereon, and accordingly rendered judgment for the plaintiff for the money so paid, deducting certain offsets specified in the case. From this judgment the defendant has appealed to this court, and we are called upon to review the decision of the circuit judge upon the single question, whether the said sections of the act aforesaid, were or were not constitutional and valid.

Under our republican system the powers of government are distributed to the executive, legislative and judiciary departments. It is the exclusive province of the legislature to enact the laws, and to pass upon all questions relating to their expediency, the time, manner and mode of their operation. It pertains to the judiciary to interpret the laws thus enacted, and to carry the same into effect. Acting in common with the legislature, under the constitution which both are sworn alike to support, it is our duty to bring all laws, when called upon in due form to enforce them, to the touchstone of the constitution, and to pronounce against the validity of all acts clearly in conflict with the fundamental law.

The invalidity of the act under which the defendant took the stock and issued the city bonds in question, is placed by the learned judge who tried the cause at the circuit, as appears from his opinion, upon *two* grounds. First, on the ground that

the sections of the act conferring the power upon the mayor and common council of Rochester to subscribe for the stock in the Genesee Valley Rail Road Company, and issue bonds to pay for the same, were not duly passed in conformity with forms prescribed in the constitution. Secondly, on the ground that the legislature could not confer upon municipal corporations, and the defendant could not exercise, the powers of subscribing to the stock of a rail road company and issuing bonds of the city as authorized by the charter in question.

In approaching the *discussion* of the questions presented upon this appeal, it is impossible that we should be insensible to the great importance of the cause, and of the uncommon magnitude of the interests involved in its decision. Aside from the $300,000 of the bonds of the city of Rochester, in question in this action, now, doubtless, in the hands of innocent holders who have purchased them for their full nominal amount, probably millions of other bonds, of like character, have been issued by other city and town authorities, all to be affected by our decision. The pecuniary loss to individuals which the affirmance of the decision of the circuit judge will involve, the check it will give to many important public improvements in this state and elsewhere, and the disastrous influence it must have upon public credit, and upon the character of the cities and towns, and of the states under whose authority and laws these bonds have been issued, can scarcely be over estimated. Considerations of this kind, while they cannot be unheeded or unappreciated by the court, cannot be permitted to divert us from our duty, to declare the law according to our convictions, irrespective of the consequences. They may, however, most fitly be permitted to exercise a proper influence in impressing upon us the duty of more than ordinary carefulness in our investigations, deliberations and conclusions.

The first question presented upon this appeal is purely one of *form.* It is not the first question in the order discussed in the opinion of the circuit judge, but meets us *in limine* in the case, and should, we think, be first considered ; for if the objection it presents is well taken, it is necessarily conclusive of the cause.

This question is based upon the decision of the court of appeals in *Barto* v. *Himrod*, (4 *Selden*, 483 ;) *Thorne* v. *Cramer*, (15 *Barb*. 112,) and *Bradley* v. *Baxter*, (*id*. 122.) These cases arose under the act " to establish free schools throughout the state, passed March 26, 1849." The tenth section of that act was as follows : " The electors shall determine by ballot at the annual election to be held in November next, *whether this act shall or shall not. become a law.*" Sections 11, 12, 8, 13 provide for submitting the question to the people at the next election, and prescribe the form of the proceedings for that purpose. The 14th section was as follows : " In case a majority of all the votes in the state shall be cast against the new school law, this act shall be null and void, and in case a majority of all the votes in the state shall be cast for the new school law, *then this act shall become a law,* and shall take effect on the first day of January, 1850." The court of appeals held that this act was invalid, " because the provisions contained in it in relation to free schools were never constitutionally enacted." Judge Ruggles who gave the leading opinion, says of the provisions of the act, that " they were not law or to become law until they had received a majority of the votes of the people at the. general election, in their favor, nor unless they received such majority. It results, therefore, unavoidably from the terms of the act itself, that it was the popular vote which made the law. The legislature prepared the *plan* or *project*, and *submitted it to the people to be passed or rejected.*" Judge Willard, who also gives an opinion in the case, says of it : " In short, the law was a mere *proposition submitted to the people, to be adopted or rejected, as they please.*" It is upon this ground that the decision was put : that the act in question had none of the properties of a law—that it was a mere *project or proposition* of the legislature submitted to the people for their adoption or rejection. It is, of course, an authoritative and binding adjudication upon the case presented, and affords a conclusive rule for the decision of all cases depending upon the same facts. While we bow to its decision on the point presented, we are at liberty to dissent from some of the reasoning advanced for the

Clarke *v.* City of Rochester.

decision, and submit, with respect, that the soundness of some of the conclusions or views contained in the opinions of the learned judges who gave the opinion of the court, may well be questioned. But the case doubtless establishes the rule in this state, and the legislators cannot evade the responsibility of passing *general acts* by submitting a project of a law to the people for their acceptance or rejection.

We come then to the question whether the rule thus established applies to the sections of the act to amend the charter of the city, under which the points in controversy now presented to the courts have arisen. The act in which these sections are contained is entitled "An act to amend an act entitled an act to amend and consolidate the several acts relating to the city of Rochester, passed April 10, 1850, passed July 3d, 1851, three-fifths being present," as the same appears in the session laws of 1851, ch. 38, 9, p. 757. The act consists of 24 sections, containing provisions in respect to a great variety of particulars before the sections 285, 6, 7 and 9, 290, 91 and 92, in question, occur, which are additions to the charter. Section 285 declares that "It shall be lawful for the common council of the city of Rochester to borrow, on the faith and credit of said city, any sum of money not exceeding $300,000, for a term not exceeding twenty years, at a rate of interest not exceeding seven per cent per annum, and to execute bonds therefor, under the corporate seal and the signature of the mayor, and such other officers as the common council may designate ; the bonds so to be executed may be in such sums and payable in such places and times, not exceeding twenty years, and in such form, as the common council may deem expedient." Section 286 authorizes the common council to dispose of such bonds in such manner as they shall deem advantageous for the city, and the money which shall be so raised to be invested in the stock of the Rochester and Genesee Valley Rail Road Company, and employed and used in the construction of said rail road *buildings* and *appurtenances, and for no other purpose ;* and the common council was authorized to subscribe for or purchase said stock, to the amount of $300,000, the city to acquire all the rights and priv-

ileges and be liable to all the responsibilities of stockholders.
Section 287 provides that the dividends to be received on the
stock shall be applied to pay the interest on the bonds, and
in case of a deficiency, the amount to be made up by taxa-
tion, in the same manner as other city expenses. Section 288
allows the common council to loan the money to be received
on the bonds, before it shall be required in the construction
of the road, to banks. Section 289 authorizes the common
council to exchange the stock for the bonds, or to sell the
same. Section 290 provides that the common council shall
nominate and appoint one director in the rail road company
for every $75,000 of stock held by the city at the time of
any election of directors. Section 291 declares that the pre-
ceding sections 285, 286, 287, 288, 289, 290, together with this
section, (sec. 291,) shall not take effect until they shall be sub-
mitted to the electors of the city of Rochester, qualified to vote
for charter officers of said city, at such times as the common
council shall direct, for the purpose of determining "*whether
or not it is expedient for said city to borrow the money men-
tioned in said sections for the purpose therein specified,*" and
provides also particularly how the election shall be conducted,
the votes canvassed, the result ascertained, and a certificate
thereof filed in the city clerk's office, in the same manner as
at the other charter elections. Section 292 is as follows : " If
the said sections 285, 286, 287, 288, 289, 290, 291, shall be
approved by two-thirds of the votes of the electors of said
city and voting at such elections, as above prescribed, then the
same shall take effect immediately after the filing of the cer-
tificate of such approval of the said act by the mayor and clerk
of the said common council."

In construing this statute, both in reference to its consti-
tutionality and in respect to its legal force and operation, we
are to be governed by certain clearly defined rules.

1st. In respect to its constitutionality. We can declare an
act of the legislature void only when it violates the constitu-
tion, *clearly, palpably, plainly,* and in such manner as to
leave *no doubt* or *hesitation* on our minds. This rule is very

generally asserted in the courts of this country by the judges of the United States and state courts: (6 *Cranch,* 87.  4 *Dallas,* 14.  3 *Serg. & R.* 178.  12 *Wheat.* 270.  10 *Conn. R.* 522.  1 *Cowen,* 550.  13 *Pick.* 60.  21 *Penn. R.* 9.  *Harris,* 164.  *Sharpless* v. *The Mayor of Philadelphia.*)  In 14 *Mass. R.* 345, (*Adam* v. *How,*) the rule is thus stated: "The legislature is in the first instance to be judge of its own constitutional powers, and it is only when manifest assumption of authority, or misapprehension of it *clearly appears,* that the judicial power will refuse to execute the law." And in *Wellington* v. *Petitioners,* (16 *Pick.* 95,) Chief Justice Shaw says the courts should "never declare a statute void unless the nullity and invalidity of the act was placed, in their judgment, beyond reasonable doubt;" and such is the rule as laid down by the judges in most of the state courts.  2d. So in the exposition of a statute, it is the duty of the court to seek to ascertain and to carry out the intention of the legislature in its enactment, and to give full effect to such intention; and they are bound so to construe the statute, if practicable, as to give it force and validity, rather than to avoid it, or render it nugatory.  (*Dwar. on Stat.* 690.  2 *Rol.* 126.  11 *Coke,* 73.)

Looking at this act in the light of these principles, and assuming that the legislature had no purpose, in its passage, to transcend its constitutional powers, we come then to the inquiry, what is the true interpretation of the act in respect, in this connection, to the principles and rules which must govern the enactment of laws as declared in the case of *Barto* v. *Himrod.*  The inhabitants of the city of Rochester were many years since created a corporation for municipal purposes, by the name of "The City of Rochester."  The act of July 3, 1851, was an act amending the charter of the city, and contains a great variety of provisions enlarging and modifying the powers previously granted.  The incorporation of the sections 285 to 291, inclusive, in the act, was designed as an enlargement of the powers of the city government.  Municipal, like private corporations, derive all their powers from the legislature, which may grant such powers as it pleases, and may

enlarge, abridge or take away such powers as are of a pure municipal character, in its legislative discretion. The power conferred upon the common council in these sections, we will assume, at this stage of the discussion, to be entirely within the limits of the legislative power. In section 285, explicit power is given to the common council to borrow $300,000, on the faith and credit of the city, and issue bonds therefor under the corporate seal. Section 286 directs that the money so borrowed shall be invested in the stock of the Genesee Valley Rail Road Company, and *employed* and *used in the construction of the said rail road.* The intention of the legislature was very clearly to give to the city of Rochester power to aid with this $300,000 in the construction of the Rochester and Genesee Valley Rail Road. This road, it appears in the case, is "a road commencing at the city of Rochester and running southerly along the valley of the Genesee river, and when completed is to terminate at Portage, in the county of Allegany." That this enterprise was one of public utility, and one locally beneficial to the city of Rochester, the legislature have clearly determined. Whether it was to be relatively of such local benefit as to warrant the city in incurring a debt of $300,000 for its construction, was a question the legislature did not decide. It gave the power, and left it for the corporation, the body of the citizens, to determine that question for themselves. The power thus conferred upon the people of Rochester was not, within the case of *Barto* v. *Himrod,* a delegation of the power to *pass the law,* but a fit and proper restraint or limitation upon the power granted in the said act, and entirely within the limits of the legislative discretion. The act itself was complete when it had passed the two houses of the legislature and received the signature of the governor. It had all the attributes of a law. It was *perfect, final* and *decisive in all its parts.* Its final section, in explicit terms, declares that " *This act shall take effect immediately.*" It imparted new power to the corporation, which it might or might not accept and exercise; but the legislature had done all its duty in the matter— exercised its full discretion on the subject, and left it for the

Clarke *v.* City of Rochester.

city to accept or not, the power conferred. It left no matter to the discretion of the citizens of Rochester, except what related to the execution of the law. The power to make a law includes and implies the power to fix and determine its *terms, conditions* and *provisions.* No such power was conferred by this act. The question referred to the electors of the city of Rochester was, in substance and effect, whether the charter privileges offered by the legislature should or should not be accepted. The election to be held, as prescribed in section 291, was "*for the purpose of determining· whether or not it was expedient for said city to borrow the money mentioned in said sections, for the purpose therein specified."* The legislature passed an act giving enlarged power to the common council, subject to the acceptance, assent and approval of the corporation. The common council is not the corporation. It is the mere local legislature of the city. The inhabitants of the city are the corporation. (*Sec.* 2 *of charter.*) The legislature provided that the powers specified in these sections should not be exercised by the common council without the consent of the corporators, to be ascertained in a prescribed legal form of an election. The powers specified in the sections were dormant ; were yet *in fieri,* until the corporators accepted them and assented to their exercise, (4 *Wheat.* 688,) precisely as is the case with every charter to a municipal or private corporation ever granted by the legislature. Every such charter, and every enlargement of its powers and franchises, require the assent and acceptance of the corporators. This consent may be, and ordinarily is, *implied,* from the application for the charter, the beneficial nature of the grant or the exercise of the corporate powers, but in principle it is supposed to be always given, either expressly or impliedly. (*Angell on Corp.* 51. *Kyd on Corp.* 65. *Wilcock on Mun. Corp.* 27–30. 4 *Wheat.* 518.)

In this case the legislature deemed it fit to require an *express acceptance* of the powers proposed to be conferred upon the legislative agents of the defendant before they should have authority to commit the corporation to the large debt in question and

. the contingent liability to the taxation involved in its creation. It was entirely optional with the city of Rochester whether the proposed grant of power should or should not be accepted. The state could not enforce the grant upon the city against its will, and this would have been so if the provision for an express acceptance of the new charter had been omitted. ( *Willcock on Municipal Corp*. 30.   3 *Hill*, 541.   3 *Term R*. 240.)   It is therefore a case of proper and legitimate, if not necessary, *conditional legislation*.   It is the precise case mentioned by Judge Ruggles in *Barto* v. *Himrod*, of a statute which is a law *in presenti*, to take effect *in futuro*.   It is a perfect grant of power, to take effect on its acceptance by the corporation.   It is just such conditional legislation in substance and effect, as our statute books are full of, from the time the people of this state assumed the right to govern themselves and pass through their own legislature such laws as they deemed best adapted to promote their welfare and happiness.   The act amending the charter of the city of New York, and providing for the construction of the Croton water works was just such an act, and provided for the express acceptance of the grant in the same manner as in this case.   (*See Sess. L*. 1834, *p*. 451.)   Of all the various charters of cities, banks, turnpike and rail road companies, and other numerous municipal and private corporations organized in this state since the revolution, the acts have not uniformly created the corporation in *express words*.   They have in many, if not in most cases, merely conferred a power or authority to organize the corporation.   Acts *in pais*, in acceptance of the charter, in adopting it, complying with its provisions, and organizing under it, have generally been essential to bring the corporation into being.   Have the corporators in all these cases created the corporation ?   The legislature, a few years since, authorized the Rochester and Auburn and the Auburn and Syracuse rail road companies, with the consent of their stockholders, to consolidate their stock and organize a new corporation.   The Rochester and Syracuse Rail Road Company came into corporate existence under this act.   And a few years subsequently all the rail road companies between Albany and Buffalo were authorized to unite

Clarke v. City of Rochester.

their stock and capital and organize a new company. They did so, and named it the New York Central Rail Road Company. Did the legislature or these rail road companies create the new corporations ? Numerous other instances of like conditional legislation in granting provisional powers might be cited. This principle is well stated by Judge Marshall in *Slack* v. *The - Maysville and Lexington Rail Road Company*, (9 *Monroe's Rep.* 526.) He says, " It is not essential to the character and force of a law that the legislative enactment should itself command to be done every thing for which it provides. The legislative power to command a particular thing to be done, includes the power to authorize it to be done. The act done under authority conferred by the legislature, is as precisely legal and valid as if done in obedience to a legislative command. So far as such statute confers authority and discretion, it is as obligatory from the first as the legislative power could make it `; and although its further practical efficiency may depend upon the discretionary act of some other body or individual, it is not derived from that, but from the will of the legislature, which authorized the act and prescribed the consequences." And in *Rice* v. *Foster*, (4 *Harrington*, 479,) decided by the court of appeals of Delaware, the chief justice says : " A law altering, abridging or enlarging the vested powers of corporations aggregate, subject to the consent of the corporation, or a law giving to school districts a portion of the school fund, on condition that such district will raise an equivalent or proportional sum, are all instances of proper conditional legislation, even though the assent of the corporations in the one case to the change of their charter, or of the district in the other to accept the donation and comply with its terms, should be signified by a majority vote. They are all good conditions, capable of being performed without in any way interfering with the legislative will." And again the same learned judge says : " To say that the authority given to the school voters, the members of a corporation, to determine whether a tax shall be laid or not, is a grant of legislative power, is an abuse of language." In same case Judge Harrington asserts the same views. And in the very able opinion of Judge Ranney, who

gives the unanimous opinion of the supreme court of Ohio, in a case in all its particulars quite like this, (*McCook's Ohio Rep.* 78,) after speaking of the school laws of the state, and the erection of town houses by vote of the town, he says: "Every act of incorporation ever passed necessarily refers the question of its acceptance to the corporators. These all present cases where the discretion is left to the body of those interested or to be affected. But because such discretion is given, are these and all other similar enactments to be deemed imperfect and nugatory? It would take a bold man to affirm it. In what does the discretion consist? Certainly not in fixing the terms and conditions upon which the act may be performed or the obligations thereupon attaching. These are all irrevocably prescribed by the legislature, and whenever called into operation conclusively govern every step taken." Also in *Mooers* v. *The City of Reading*, (9 *Harris' R.* 202,) in a case where it had been left to the voters of the city of Reading to determine whether the city should take stock in a rail road company, the supreme court held that "there was no delegation of legislative power, and they could see no reason why the *acceptance* of a new power tendered to a public corporation, may not be made to depend on the will of the people, when it is expressed by themselves as when it is spoken by the mouths of their officers and agents."

To say in this case that the act vesting the power in the common council to contract the debt, and subscribe for the stock subject to the acceptance of the citizens of Rochester, on their approval thereof in the form prescribed, was a delegation of legislative power, was conferring power upon the citizens of Rochester to *pass the law*, is truly as was said by my brother Johnson, in *Johnson* v. *Rich*, (9 *Barb.* 684,) a "sheer confounding of all proper distinctions;" is an abuse of language; and so to hold would be a gross invasion of the discretion and rightful authority of the legislature."

But upon this question of *form*, so far from being clearly and palpably unconstitutional, we think the act in question is in substance and effect in the form, and after the model suggested or prescribed in the constitution itself, in relation to the

*same subject matter*, the *creation of public debts;* and is in this particular, in precise and distinct conformity with its spirit and intent. Probably no single sentiment was more pervading in the public mind shortly before the convention of 1846, or more contributed to the calling of the convention, than a desire to impose some restraint upon the power of the legislature to contract public debts. The country had just passed through a period of extreme financial embarrassment. Many state and corporate debts had been repudiated, or the interest thereon had not been paid, and it perhaps may not be amiss, or do any injustice to history to say, that there was prevailing throughout the whole country at that time, a sort of feverish excitement on the subject of state and corporate debts. The members of the convention, elected under the influence of this sentiment, doubtless thoroughly sympathized on this subject with this general feeling of the people. Their apprehensions and their remedy in respect to this great evil, are illustrated in the 7th article of the constitution. Section 9 provides that the credit of the state "shall not in any manner be given or loaned to or in aid of any individual, association or corporation." This provision cuts up one prolific source of the evil complained of. Section 10 limits the power of the state to borrow money to meet casual deficits and failures of revenues and expenses not provided for, to the amount of $1,000,000. Section 11 allows other debts to be contracted to repel invasion, supress insurrection and defend the state in time of war ; and section 12 provides that no debt except the above shall be contracted, unless such debt shall be authorized by a *law* for some single work— such *law* to impose a tax to pay interest and discharge the principal within 18 years—and " no such *law* shall *take effect* until it shall have been submitted to the people and have received a majority of all the votes cast for or against it at such election." " On the final passage of such *bill*, the question shall be taken by ayes and noes," &c. " to be entered on the journal thereof, and shall be : ' shall this bill pass, and ought the same to receive the sanction of the people ?' The legislature may at any time after the *approval of such law by the people* forbid

the contracting of· the debt," &c. " No such *law* shall be submitted to be voted on within three months *after its passage*, or when *any other law* shall be submitted to be voted for or against."

It will be seen from the above, that before the passage of an act providing for the contracting of a state debt under the foregoing provisions of the constitution, the project or proposition is appropriately called a *bill*. After it has passed the two houses, and before its approval by the people, it is called a *law*—of course the governor's signature to it is to be implied, for this must necessarily precede its submission to the people. By the language and clear implication from the terms of this section, the *bill* has become and is a *law*, before its submission to the people. It is not submitted to the people to *pass the law* —there is no delegation of power to the people to *pass the law*. It is complete and perfect when it is submitted, and is submitted for the *approval of the people*. To call this legislation by the people is an entire misnomer—a total misconception of the whole section and its object. It was designed simply as another *check* to hasty and improvident legislation in addition to the veto of the governor. It was designed, in the expressive language of Mr. Hoffman, the chairman of the committee who reported it to the convention, as another " safeguard," " to protect the people in all their rights from the dreadful calamity of a great debt." This safeguard· was " the people at large."

In the precise *form* prescribed by the constitution to the legislature when it is proposed to · create a *state debt*, and in the precise language of the constitution itself when such is the object, the legislature have passed the amendments to the charter of the city of Rochester in question in this suit. The reason being the same for the same course of proceeding where the object of the proposed law is to create a *city* or *corporate debt*, the legislature have adopted the same mode of proceeding as though it were a state debt. It has left it to those who are to be liable *to pay* the debt, if one is contracted, to say whether the debt shall or shall not be contracted. The spirit—the pre-

scription of the constitution has been, in this instance, most · faithfully followed and obeyed. It cannot be, that an act thus passed can fairly be pronounced to be *clearly* and *palpably* in conflict with the constitution. It may be that the people will judge and decide unwisely in respect to state and city debts under such submissions to them, but who has the right so to say ? If the people of such a city as Rochester in respect to a proposed city debt, or the people of this state at large. in respect to the contraction of a state debt, cannot be trusted to decide finally the question for themselves, the whole theory of popular sovereignty is a delusion, and it must be admitted that our people are incapable of self government. In all forms of government, there is doubtless much abuse in the contracting of public debts, but in this particular it has always been supposed in this country, that republican government afforded the best guaranty for the protection of the interests of the people in the fact that those who are to *bear the consequences* involved in the contraction of such debts, must themselves consent to or *commit the folly.* But if this consideration be not sufficient to deter a practical and highly intelligent people from rushing heedlessly and improvidently into debt, it is not the duty of the judiciary to save them from learning such a salutary lesson of wisdom as. the tax gatherer is particularly adapted to inculcate, or to relieve them from the dishonor of repudiation, by a doubtful interpretation of the law, or a strained and questionable construction of the constitution.

*Secondly.* We come next to the second question for discussion, whether independent of the questions above discussed, the legislature could constitutionally confer, and the city could possess and exercise, the power specified in the sections of the charter aforesaid.

I do not understand from the opinion of the circuit judge that he finds any section or portion of the constitution with which these sections of the charter come expressly in conflict, upon which he rests his opinion, or that they violate *directly* any particular provision of the constitution, except incidentally, as hereinafter mentioned.· The chief argument of the learned

Clarke *v.* City of Rochester.

judge is that the subscription to this stock and the issuing of the city bonds to pay therefor, involve, or may involve, a resort to taxation to pay the principal and interest in whole or in part upon the bonds; and that municipal corporations, being organized only for political purposes, can only exercise or be authorized to exercise the right of taxation "in respect to the proper public burthens incident to the city government and the exercise of the political powers." The learned judge says in another part of his opinion, that ".the decision of the question might very properly be rested, in the absence of any express power conferred by the people, in the constitution, and aside from any of the prohibitory and restraining clauses in the instrument, upon the absolute want of power in municipal corporations to burthen or tax the property of the citizens for the purpose named, and the want of jurisdiction in the state legislature to confer the right." This view involves a discussion of the theory and powers of government under our system. At the revolution all power reverted to the people, and they were at liberty to institute and establish such government as they deemed best calculated to secure their rights and liberties, and most conducive to their safety and happiness. In their original capacity, through delegates to a convention for that purpose chosen, they ordained and established the present form of government, and vested the supreme legislative power of the state in two separate bodies of men, one called the ASSEMBLY and the other the SENATE. The legislative power thus vested was and is undefined and unlimited in terms, as it is in its nature undefinable as to its extent. All the original inherent power of the people to legislate for themselves, to provide for their general welfare, and to promote their common interest and happiness, was conferred upon the legislative department of government thus created. The powers of the legislature were then and are still as omnipotent as those of the British parliament, except as the people have since delegated portions of their original power to the general government, and have restricted or limited the legislature in our state constitution. The constitution of the United States and that of our own state

Clarke *v.* City of Rochester.

constitute the only restriction or limitation of the legislative power. It is, aside from these limitations, supreme, uncontrollable, and omnipotent, in respect to all other matters and subjects. The taxing power is one of the inherent powers of government, and belongs appropriately to the legislative department. (4 *Wheat.* 428. 4 *Peters,* 514, 561, 563. 4 *Comst.* 419, 29. 3 *Kern.* 144.) Within the limits of legitimate taxation the legislative discretion is utterly uncontrollable, as it is undefinable in its *objects, purposes, uses* and *extent.* The legislature cannot under this taxing power take the property of one man and transfer it to another, for that would violate the provision of the constitution "that no one shall be deprived of life, liberty and property without due process of law." It cannot take the property of individuals for public use without just compensation ; but short of that extent, and so far as the tax is general or imposed upon all, or all of a class of persons within prescribed limits or districts upon some common principle or rule, and the tax is for some public purpose, there is no limit to the power of the legislature to authorize taxation, and no remedy or mode of correction for unjust laws involving such taxation, but through the ballot box.

This brings us to the inquiry what works or objects are for the *public benefit,* or are of such a public character as to justify such taxation. Rail roads are clearly works constructed for the public benefit. They are not mere private enterprises, built and operated exclusively for the benefit of the stockholders. The right of private corporations to take property is the right of the state, the right of eminent domain, and can only be justified and sustained on the ground that the lands so taken are taken for the public use. Lands for this purpose may be so taken on payment of a just compensation, precisely as the state might by its own agents take the same. This is the ground upon which this right was put by the chancellor, in *Beekman* v. *The Saratoga Rail Road Company,* (3 *Paige,* 45,) and by the supreme court in *Bloodgood* v. *Mohawk Rail Road Company,* (14 *Wend.* 57,) which last case was affirmed in the court for the correction of errors, (18 *Wend.* 9,) and the same doctrine has since been re-

peatedly acted upon and asserted in the courts of this state. The doctrine of all these cases is that the state itself might construct these works at the public expense; and that what it may lawfully *do* for the public benefit, it may authorize corporations to do as its agents. The state might construct these rail roads by its own agents, with the funds of the state, as it does canals; or it might take stock in all or any of these rail road companies. The state was a stockholder in all the early banks chartered in this state; in the Bank of North America, the New York Bank, the Albany Bank, the Farmers' Bank, and the State Bank, and most others chartered under the constitution of 1777. Instead of building rail roads, turnpike roads, constructing bridges over large streams, making slack water navigation upon our rivers, and doing many other acts of internal improvement, the state has authorized corporations to do the same thing. Such has ever been the policy and the practice of the state, since it exercised the powers of an independent sovereignty.

But if the state had undertaken to construct all such works as state works for the benefit of the state, as it has the canals, many of such works would, and must obviously, be of especial local benefit to some parts of the state and of no particular benefit to other parts. Can there be any doubt that the state might have imposed taxes in respect to such questions of local benefit? Could it not tax cities, or towns, or counties, to meet such local benefits? and if it had done so, who could question the legislative discretion or power on the subject? All the taxation and assessments of municipal corporations is made and sustained upon the ground of benefit locally conferred. In 4 *Comstock*, 424, Judge Ruggles says: "Taxation exacts money or services from individuals as and for their respective shares of contribution to any public burdens." Municipal corporations possess too in a large degree the rights and franchises of private corporations. All cities as such have more or less property. They own or may own their gas works, water works, school and market houses, city halls, court houses, bridges, (and in some instances collect toll thereon,) and other works, and for aught I can see, under state authority might erect and operate a flour-

ing mill for the benefit of the inhabitants of the city. This consideration seems to have been overlooked by the learned circuit judge. The views expressed in his opinion treat municipal corporations as *mere political bodies,* created for purely governmental purposes and incapable of exercising any other powers. The chief design of municipal corporations is doubtless to promote the interests of the locality in respect to mere civil government, but other powers and franchises may be annexed to and exercised by the corporations, as is probably the case with most of the municipal corporations in the state. In the case of *Bailey* v. *The Mayor of New York,* (3 *Hill,* 531,) Chief Justice Nelson, giving the opinion of the supreme court, puts the liability of the corporation to pay for damages resulting from the unskillful construction of a dam across the Croton river for the supply of water to New York city, upon the express ground that " the defendants *quoad hoc* were to be regarded as a private company." He says : " It [the corporation] stands on the same footing as would any individual or body of persons upon whom the like special franchise had been conferred," and cites a large number of authorities on the point. This decision too was affirmed in the court for the correction of errors. (2 *Denio,* 433.) In this case Chief Justice Nelson puts a hypothetical case quite in point. He says : " Suppose the legislature instead of the franchise in question had conferred upon the defendants banking powers, or a charter for a rail road leading into the city, in the usual manner in which such powers are conferred upon private corporations, could it be doubted that they would have the same character and be subject to the same duties and liabilities ?" How far it is wise to confer such franchises upon municipal bodies may well be doubted ; but that is a question for the legislature. In all such cases and upon all such questions the legislature is the exclusive power to determine what franchises shall be conferred upon municipal and private corporations, and to determine also upon the expediency of the construction of any class of improvements, and to determine the question whether they are or are not works for the public benefit. No power exists under the constitution to review their

decision, except the power of the people to change their legis-lators. Certainly the judiciary has no power to review the de-cision of the legislature upon such questions. To do so would be to assume the rights of a council of revision; would make the judiciary a sort of despotic power in the state to determine what laws the people should or should not make; would make it a power odious and unendurable. The subscription to the stock of the rail road by the city, and the issuing of the city bonds to pay for the same, does undoubtedly, as the learned judge holds, involve the necessity of levying a tax to pay principal and interest; and if such tax cannot lawfully be imposed, the act or section thereof in question must be invalid.

But the right of the legislature to authorize a local tax, it seems to us, cannot *seriously* be controverted. It is dis-tinctly asserted, in the case of *Thomas* v. *Leland,* (24 *Wend.* 65,) where the legislature authorized a tax upon the city of Utica to defray the expense incurred by a change in the termi-nation of the Chenango canal. It is also distinctly asserted in the opinion of Chancellor Walworth, in the case of *The Mayor of New York* v. *Livingston,* in the court for the correction of errors, (8 *Wend.* 101,) in these words: "It is a well settled principle, that when any particular county, district or neighbor-hood is exclusively benefited by a public improvement, the in-habitants of that district may be taxed for the whole expense of the improvement, in proportion to the supposed benefits re-ceived by each." This case and doctrine is substantially re-affirmed by the court of appeals, in *The People* v. *The Mayor of Brooklyn,* (4 *Comst.* 436; 3 *Kern.* 144.)

That rail roads are public improvements, which the state may construct, itself, or authorize to be constructed by corpora-tions; that the state may be a stockholder in such a corpora-tion, and may also authorize municipal corporations to become stockholders therein, and may levy taxes to pay interest and principal upon such stock, and authorize municipal corporations to levy a local tax for that purpose, is also fully established by the following cases in other states: In the case of *Sharpless* v. *The Mayor of Philadelphia,* (21 *Penn. State Rep.* 9 *Harris,*

148,) in which the opinion, of remarkable ability, is given by the late chief justice, now attorney general of the United States. Also, in the case of the *Cincinnati Rail Road Company* v. *Clinton County*, (1 *McCook's Ohio State Rep.*) in which case the unanimous opinion of the court is given, in a most able and complete discussion of the whole subject, by Judge Ranney. Also in *City of Bridgeport* v. *Housatonic Rail Road*, (15 *Conn. R.* 475.) Also, in the case of *Goodwin* v. *Crump*, (8 *Leigh's Virg. R.* 120,) in which the court of appeals of Virginia affirmed the power of the legislature to enlarge the corporate powers of the city of Richmond, *with the assent of a majority*, so as to enable it to subscribe to stock of the James River and Kenhawa Company, incorporated for the purpose of uniting the water of James river with the Ohio, by a canal or rail road, and bind the minority. Also, in the case of *Nicol* v. *The Mayor of Nashville*, (9 *Humph. R.* 252,) in which a law authorizing the city of Nashville to subscribe to the stock of a rail road was sustained by the supreme court of Tennessee. Also, in the case of *Talbot* v. *Dent*, (9 *B. Monroe*, 526,) in which the validity of a subscription by the city of Louisville to the stock of the Louisville and Frankfort Rail Road Company was sustained; and also in the case of *Slack* v. *The Maysville and Lexington R. R. Co.* (*supra*,) by the courts of Kentucky, and also in the case of *Cheeney* v. *Howe*, (9 *B. Monroe*, 250.) This current of authority from six other states having substantially the same constitutions, so far as it relates to the subject in question, and the same common law, ought to be quite decisive on this question.

The doctrine of the learned judge, in holding that the invalidity of the sections of the act in question may be "rested upon the absence of any express power conferred by the people, in the constitution, upon the legislature, to authorize a municipal corporation to burthen or tax the citizens for the purpose named therein," is thus in conflict with the whole theory of our government relating to the legislative power. It proceeds upon the principle that the powers of the state governments, or the state legislatures, are *delegated* powers, which is opposed

to what is generally understood and received as sound law in respect to the relative powers of the national and state governments. If there be any doctrine that may be deemed settled, so far as to have the force of a political and legal axiom, it is that the powers of the general government are *delegated,* and those of the state governments are *original and reserved.* The views of the learned judge, so far as they go to *imply* a restriction upon the legislative power to authorize the subscriptions to the stock in question, by the defendants, are clearly untenable, if the preceding views are correct, and if it be true that the courts should only declare a law void where it is clearly in conflict with some particular provision of the constitution. Laws may doubtless be held invalid when they *impliedly* violate the constitution, as much so as when they expressly come in conflict with some of its distinct provisions. But in such case the implication must be *necessary* and *legitimate,* and based upon some express portion of the constitution. If the legislature, for instance, should pass an act directing a new trial of a cause in a court of law, or granting a pardon, after conviction, for some criminal offense, we could say the acts were void, on the ground that the legislature had invaded the province of the judiciary, or that of the executive department. So in a great variety of cases that might be suggested, where the acts of the legislature are not within the scope of the powers conferred by the constitution upon the legislative department, or exceed the limits of its power defined or restricted in respect to some particular subject matter. But the implication, in all such cases, would rest upon some particular provision in the constitution, and must be *clear* and *indisputable,* on a fair construction of the constitution, and beyond *reasonable doubt.* (8 *Cranch,* 87. *Fletcher* v. *Peck,* 2 *Monroe,* 178. *City of Louisville* v. *Hiatt,* 9 *Dana,* 514.)

But the learned judge does not rest his opinion in respect to the invalidity of these sections entirely "upon the implications arising from the constitution, its object, spirit and general provisions." In one part of his opinion he says : "I will simply refer to a provision which I think expressly forbids the legis-

Clarke *v.* City of Rochester.

lature to grant the power which the act in question assumes to confer upon the common council of Rochester, and refers to the 9th section of article 8 of the constitution, which is as follows : Section 9. " It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessment and in contracting debts, by municipal corporations." And the judge also says, in respect to the same section of the constitution, " The power to tax property in aid of a private corporation, as for the purchase of its stock, is not among the ordinary powers of a municipal and local government, and requires special legislation to confer it ; and this special legislation I think clearly forbidden by this section of the constitution." This section of the constitution contains, in itself, no express prohibition upon the subject. It is merely directory to the legislature, and is entirely inoperative of its own force upon the subject to which it relates. It leaves the whole subject, as before, with the legislature, and impliedly allows that the corporation may contract debts without legislative prohibition, and certainly under the legislative authority expressly given. If the legislature could *prohibit*, it can *allow* debts to be created, and it has expressly done so in this instance, and before it had acted at all under the aforesaid section. But if it were otherwise, the legislature could *repeal* what it had enacted. The whole subject is left with the legislature, as Judge Ruggles says, in *The People* v. *Mayor of Brooklyn*, (4 *Comst.* 440,) " The direction given to restrict the power of cities and villages to make assessments, presupposes and admits the existence of the power to be restricted, and seems to remove all doubt in relation to the legislative power in question." How the learned judge can so construe this section as to make it, of its own force, a constitutional prohibition upon the legislature and upon municipal corporations, I cannot conceive. To analyze the section more clearly, the first clause is as follows : " It shall be the duty of the legislature to provide for the organization of cities and incorporated villages."

This duty to provide for their organization, implies and recog-nizes a discretion in the legislature in regard to the *terms, pow-ers* and *provisions* to be contained in the charters of cities and villages. Again: "And to restrict the powers of taxation, as-sessment, borrowing money and loaning credit." This clause also implies and recognizes both a right in the corporations, without restriction, to tax, make assessments, borrow money and loan credit ; and also a discretion in the legislature to restrict and limit this power of the corporations, and to define it ; to de-clare how much money the cities may borrow, how much debt they may create, how much money they may levy by taxation and for assessments. And the last clause : " So as to prevent abuses in assessments and in contracting debts by such munic-ipal corporations." How prevent *abuses* in these particulars, if the section itself contains a *prohibition,* both upon the legis-lature and municipal corporations ? The whole section implies a discretion in the corporations mentioned in it, without restric-tion, and imposes a duty upon the legislature, " to limit, regu-late and control that discretion." The power is with the legislature. It is wisely left there, to be exercised in its dis-cretion. It may *restrict,* and as it may *restrict* so it may *allow* the creation of city debts, and prescribe their limits and con-ditions, as is done in this case. Any other view of this section of the constitution appears to us to be utterly untenable, or at least the view that it contains an express restriction or limita-tion upon the powers of the legislature to authorize the con-tracting of debts of municipal corporations cannot be maintained. It may be, and doubtless is true, that the members of the con-vention, or many of them, who devised the present constitution, desired to restrict more stringently the power of municipal corporations on the subject of contracting city debts, and con-sidered that they needed such restraint as the learned judge suggests, but we can look at no undefined purpose not embodied in the instrument.

We are called upon to interpret the provisions clearly ex-pressed in the constitution itself. We cannot go beyond the written word, if it be clear and explicit in its terms. The con-

Clarke *v.* City of Rochester.

stitution speaks for itself. It is, in and of itself, the will of the people. We can look only to its language, not doubtful, inexplicit or ambiguous. It clearly contains no express provision that forbids the legislature from passing the act to amend the charter of the city of Rochester under consideration, or any of the sections in controversy.

In conclusion we think the following propositions may be safely affirmed to be the law upon the whole case.

*First.* That all the inherent power of the people for self government, not delegated to the general government, is reserved to, and belongs to the state.

*Second.* That of such reserved powers the entire legislative power is vested in the state legislature, subject to no restrictions or limitations, except such as are contained in the state constitution.

*Third.* That the taxing power belongs to the legislature and is subject to no limits or restrictions outside of the United States and state constitutions.

*Fourth.* That the power to authorize the construction of works of internal improvement, and to provide for their construction by the officers or agents of the state, rests with, and pertains to, the legislature, to be exercised within its exclusive discretion.

*Fifth.* That such works may be constructed by general taxation, and in case of local works, by local taxation, or the state may aid in their construction by becoming a stockholder in private corporations ; or authorize municipal corporations to become such stockholders for such purpose

*Sixth.* That rail roads are public works, and may be constructed by the state or by corporations, and lands taken for their use are taken for the *public use,* and may be so taken on payment of a just compensation.

*Seventh.* That the legislature is the exclusive judge in respect to what works are for the public benefit and in regard to the expediency of constructing such works, and as to the mode· of their construction, whether by the state or by private or municipal corporations, in whole or in part.

*Eighth.* That the legislature may authorize municipal corpo-

rations to subscribe to the stock of a rail road company, with the consent and approval of a majority of the corporators duly ascertained.

*Ninth.* That the passage of a law authorizing such subscriptions to the stock of a private corporation, subject to the assent or approval of the corporation, or to take effect upon the approval or assent of a municipal corporation by the vote of the corporators, is not a delegation of power to the corporation to pass a law, but is a legitimate case of conditional legislation, and is entirely within the discretion of the legislature.

*Tenth.* That the act to amend the charter of the city of Rochester, passed July 5, 1851, including the sections 285 to 291, inclusive, was a valid law immediately upon its passage and the signature of the governor thereto; and that the provision therein that those sections should not take effect until approved by the corporation, merely suspended the power of the common council to act upon said sections until such approval.

*Eleventh.* Finally : The acts of the city of Rochester, in subscribing for the stock of the Genesee Valley Rail Road Company, and in issuing the bonds of the city to pay for such stock as stated in the case in this action, were legal and valid acts ; and the city was entitled to take and hold such stock or to sell it to the plaintiff as valid stock, and is bound to pay the bonds so issued ; and the plaintiff was not entitled to rescind his contract for the purchase of such stock on the ground of its invalidity.

The judgment of the special term was therefore erroneous, and should be reversed, and a new trial granted, with costs to abide the event.

WELLES, J., did not hear the argument, but was present at Auburn when the case came up for decision, and had previously examined the case, the points of counsel and the foregoing opinion, in which he entirely concurred.

T. R. STRONG, J. The foundation of this action is the alleged invalidity of the provisions of the act of the legislature relating to the city of Rochester, passed July 5, 1851, which purport

to authorize the common council of the city to borrow money on the faith and credit of the city, and issue bonds therefor, and invest the same in the stock of the Genesee Valley Rail Road Company. If those provisions are invalid, the bonds issued by the common council and the subscriptions for stock in pursuance thereof, were nullities; the agreement for the purchase of the stock and bonds by the plaintiff is without consideration and void; and the plaintiff is entitled to recover back what he had paid under that agreement. One ground on which the invalidity of those provisions is asserted is, that it was not within the scope of the legislative power of the state, independent of any restrictions in the constitution upon that power, to invest a municipal corporation with authority to burthen the property of the citizens of the locality which it embraces, by becoming stockholders in a private corporation. It is not denied but that the state may provide by law for the construction of a rail road through the agency of its own officers, taking all lands necessary for the purpose by virtue of its right of eminent domain; or delegate the power to build the road and take the lands required for it, to a private corporation. Nor is it disputed that the state may, under its taxing power, charge the expense of such a public improvement, made by itself, upon the citizens of a particular locality, which may be supposed to be more immediately benefited by the improvement; nor is it controverted that a municipal corporation may be authorized by law to make such public improvements as are required by the interests of its locality, and tax the citizens of the locality to defray the expense. The power of the state, to this extent, is unquestioned, and so well established by long exercise of it, and by judicial decisions, as to render a discussion of it unnecessary, if not unprofitable. But the precise point presented is, that a subscription for stock in a rail road corporation is like an investment in the stock of a manufacturing company, or in the mercantile, or any similar private business, of a mere private nature—foreign to the office or business of government—and therefore without the limits of the sovereign power; and that the state, not possessing the power itself, cannot confer it on a municipal corporation.

It is a question upon which there is some conflict of opinion, whether there is such a limitation of legislative power as that suggested, to matters of a public nature and incident to government; and while it would seem to be proper that the power should be thus confined, there certainly would be great difficulty in maintaining, if it would not be impossible to maintain, the limitation in practice, without conceding to and claiming for the judicial department the paramount jurisdiction to determine what is and what is not public and connected with government. This jurisdiction is legislative in its nature, and there is great force in the argument that it is indispensable to the just weight and beneficial action of the legislative department that it should exclusively belong to that branch of the government. If the limitation exists, it must be applicable to cases clearly, palpably, and without question, wholly private, and in no way relating to government. If the sole right of decision on this subject is vested in the legislature, the legislative power, beyond the restrictions of the constitution, is unlimited. It is not my purpose to discuss this question, or to express any opinion upon it, as it is entirely unnecessary, in the view I take of the position under consideration.

That position, in my judgment, is fatally erroneous, in regarding and treating the subject of the provisions in question as a private business, belonging to the same class as the business of banking and of manufacturing and commercial associations, incorporated or unincorporated. Those provisions, upon their face, clearly show that the leading object of them was to enable the city to afford aid to, and thereby secure the construction of, the Genesee Valley Rail Road. A company had been formed, under the authority of the state, for building the road, to which the state had delegated all necessary power for the purpose. It was an enterprise of a public nature, committed by the state to a private company, invested by the state for the purpose of the road, with a large portion of its sovereign power. The company were authorized to take lands for the road, under the right of the state of eminent domain, or to take private property for public use, upon making just compensation. Upon

Clarke *v.* City of Rochester.

the assumption that the public good required the road should be built, only, could this authority be conferred. The road was to be in part in the city, and was to traverse one of the most fertile and richest portions of the state, inhabited by a numerous and wealthy population. It was supposed, and not without reason, that the road, if completed, would contribute largely to the business and wealth of the city, and benefit it beyond other portions of the state; and therefore it should aid in the work. Hence the legislature was appealed to for authority to render such aid, and the provisions in question were enacted. Not only is it apparent on the face of the provisions, it is also manifest from the public history of the road, of which the court may properly take notice, that such was the motive and design of the legislature. The work was of a public nature and for the public benefit, and authority was given to the city to aid it for the good of the public, and more especially of the city. Clearly the state might have built the road; no good reason is perceived why it might not have authorized the city to build it; and if it was competent for the state, in view of the public good, to confer such authority, why might not the state, influenced by the same motive, give authority to the city to aid a rail road company in the work. The state might, doubtless, have built the road, and assessed the city beyond the rest of the state to pay the expense; and why not authorize the city, voluntarily to assume a burthen in aid of a private company, substituted for the state in respect to the work, which the state might have imposed, if the state had taken upon itself the enterprise.

The fact that the principal part of the road is out of the limits of the city, cannot affect the question of the public nature and benefit of the work, and the power of the state to grant the authority it has assumed to give. A municipal corporation may be authorized to do an act without, as well as within, its local limits, of a public character, and relating to its government, such as building an aqueduct for conveying water into a city, or a road, or canal, in the vicinity of, and connected with its locality.

Assuming the construction of the road to be a work of a pub-

lic character, which the city might be authorized to do, it seems to be clear that it might equally be authorized to assist others in doing the work. The power of the legislature over the subject being established, the expediency or propriety of its exercise in any case, cannot be reviewed by the courts. Undoubtedly the power has been and will be abused, but the only remedy under our system is in displacing, at the earliest opportunity, all legislators who are unfaithful or incompetent, and bestowing greater care in the selection of such officers.

Another ground on which the provisions in question are claimed to be invalid is, that they are, as alleged, in conflict with the constitution. Most, if not all, of the strength of the argument to sustain this point in the case, rests upon the idea, already attempted to be refuted, that the authority sought to be conferred by them, and the object of it, are of a private and not public nature. Viewing them in a light directly the reverse, they are readily seen to be harmonious with every part of the constitution. They are provisions made in the exercise of the general power of the legislature to authorize municipal corporations to do such public acts as are required by the public good, in reference to their own territorial limits—the same power to which must be referred the grant of authority to such corporations to lay out and open streets, and keep them in repair, and make other similar local public improvements, incident to and proper for the good government of the community.

This power is clear and indisputable, and it is distinctly conceded in the opinion, in this case, of the learned justice at special term. He says, in reference to the city, the legislature "might cause all necessary streets to be laid out, opened and worked, and all local improvements to be made, and do whatever else within the locality they should deem proper for the good government of the community, and assess the expenses as a part of the public burthen upon the community, for whose benefit the expense should be incurred, or such part of the community as they should think right by reason of the particular benefits to be charged; and this power may be delegated to the common council of the city, for the locality embraced within its

boundaries." Obviously, as already stated, it is not indispensable that the improvements should be wholly within the city, for although, as a general rule, the powers of a city are to be exercised without its locality, the legislature may authorize improvements within that locality for the benefit of the city. · Its power to do this is as ample as its power to create the city originally, and prescribe its limits and authority.

The 9th section of article 8 of the constitution, imposing upon the legislature the duty to provide for the organization of cities and villages, and to restrict the power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and contracting debts, by such corporations, is particularly relied on as prohibiting the legislation under consideration. The design of this section, so far as it makes it a duty of the legislature to restrict the power of taxation, &c. of cities and villages, was, in my judgment, to guard by proper limitations, against abuse in contracting debts, in the exercise of the powers granted to it by the legislature, not to limit the legislature in granting power to such corporations. If the latter had been the object, some attempt would have been made to specify and define the powers which might be granted. The subject would not have been left without specification and definition. What power may be granted? Where does the line of prohibition commence? The sections contain no answer to these questions. They are silent as to the powers which may be granted; the legislature may grant such powers as itself possesses, but must provide against the abuse of these powers, so far as relates to contracting debts, assessments and taxation.

A further objection to the validity of the legislation in question is, that the legislature had not power under the constitution, to delegate to the electors of the city, the decision of the question whether the provisions should become a law—that in respect to the expediency of the law, the legislature was made by the constitution, the sole and exclusive judge. In *Barto* v. *Himrod*, (4 *Seld.* 438,) it was decided by the court of appeals, that the act known as the free school act, which contained provisions

submitting it to the electors of the state to determine whether the act should become a law; and making the fact of its becoming a law dependent upon approval by the people, although approved by them, was void for want of constitutional power in the legislature to commit to the people the decision whether the act should become a law. That case is relied on in support of the objection; and it is assumed, that the present case, as to the point raised, is substantially like it, and if it is, it must share the same fate. I have had some difficulty in coming to a satisfactory conclusion on the point, whether this case is within the principle of that cited, but after much and careful consideration, am convinced, that a plain and substantial distinction, requiring the application of different rules of decision, exists between the cases. Such a distinction does not, I believe, arise, from the circumstances that in the free school law, the language was that the electors of the state should determine whether this act "shall or shall not become a law," and in case a majority should be against it, the act "shall be null and void," and that in the case of the present legislation the language is, that the sections "shall not take effect," until they should be submitted to the electors of the city, and upon the event therein mentioned. Those expressions differ only in form—they import the same idea in substance.

An act does not become a law—a rule of action for the community, or any company, or individuals—until it takes effect, and when it takes effect it is a law. There is no such thing as a law *in presenti* to take effect *in futuro*. An act, to take effect in future, at a fixed time, or upon any certain event, must await the time or other event, to become a law; and especially is this true where the event upon which the act is to take effect is contingent, like a popular vote of approval. The true distinction, as I conceive, arises out of the difference in the nature of the subjects of these acts, and in the questions submitted to the decision of the people. The free school act was of a mandatory character, and imposed duties and obligations on the people which they would be bound to perform, if the act should become a law by their approval, entirely irrespective of

Clarke *v.* City of Rochester.

their will ; and the question submitted to the people was whether the act should become a law ; thus, as was held by the court of appeals, involving the whole subject of the propriety and expediency of the law, as well as of the strict enforcement of the various provisions, and attempting, by the legislature, to cast off the responsibility imposed upon it in the making of laws, and placing it with a majority of the people, which could not be done under the constitution. The provisions under consideration are merely permissive ; they purport only to grant an authority, which the common council, if the act should become a law, would not be bound to exercise ; and the question submitted to the people of the city, was, by the terms of the provisions, " whether or not, it is expedient for said city to borrow the money mentioned in said sections, for the purpose therein specified." It was not referred to the people to decide whether the authority should be granted ; that the legislature had determined, if two-thirds of the electors were in favor of its being exercised. The legislature gave the authority conditioned upon a popular vote in favor of borrowing the money. The form of the vote was to be, for the rail road, and against the rail road, and a vote of two-thirds for the road was to decide that it was expedient to borrow the money, while a vote exceeding two-thirds the other way was to be a decision that it was inexpedient. It is true, that a decision in favor of the expediency of borrowing the money was to be deemed an approval of the law ; as by section 292, it is declared that if the previous sections shall be approved, &c., the same shall take effect, &c., but the approval was to be implied from a vote for borrowing the money ; it was not the question submitted for decision. Nothing like power to make the law was to be vested in the people ; the legislature made the law dependent only on the event of the people wanting to use the authority. The ground of objection to the free school act seems, therefore, to be wholly inapplicable to this legislation ; and if inapplicable, the decision referred to is no authority against it.

Again, it is conceded in the opinion in this case, at special term, and supported by the reasoning of the learned judges

who delivered opinions in *Barto* v. *Himrod*, that a legislative grant of power to a municipal corporation, with a restriction upon its exercise without the consent of the people to be affected by it, would be valid; and this is substantially a law of that character. There is no difference, in practical or legal effect, between an act conferring power to borrow money upon the event of the people deciding, in a mode provided by the act, that it is expedient to borrow, and an act vesting the power absolutely, but prohibiting its exercise, unless the people shall decide it is expedient. In neither case, do the people decide, except impliedly and by inference, upon the expediency of the law.

I perceive no objection, arising out of the constitution, to making a mere permissive law depend upon a vote of those designed to be benefited by the permission, in favor of the expediency of doing the act permitted. The whole legislative power is exerted, and the whole responsibility in regard to the law exercised by the legislature in such a case: no part of it is referred to others. In the opinions in *Barto* v. *Himrod*, it is admitted that conditional legislation, where there is no transfer of the legislative power or judgment, is allowable; and Ruggles, J., in his opinion, defines such allowable conditional legislation. He says: " the event or change of circumstances on which a law may be made to take effect, must be such as in the judgment of the legislature affects the question of the expediency of the law; an event on which the expediency of the law, in the judgment of the lawmakers, depend. On this question of expediency the legislature must exercise its own judgment definitively and finally. When a law is made to take effect on the happening of such an event, the legislature in effect declares the law inexpedient if the event should not happen; but expedient if it should happen. They appeal to no other men or man to judge for them in relation to its present or future expediency. They exercise that power themselves, and then perform the duty which the constitution imposes on them." These remarks accurately describe the law in question.

Clarke *v.* City of Rochester.

The other objections taken to the validity of the law are, in my opinion, untenable.

My conclusion is, that the judgment at special term is erroneous and should be reversed.

JOHNSON, J., (dissenting.) I entertain no doubt whatever of the power of the legislature, to enact a law, conferring authority upon the city of Rochester, or any other city or town, to make a valid subscription to the stock of a rail road corporation where the road runs through it, or terminates within its boundaries, and is calculated in some measure to contribute to the convenience and prosperity of its inhabitants. It is manifestly a subject of law, and therefore within the scope of the law-making power, unless excluded by some constitutional restriction. There is no restriction on this subject in the constitution. On the contrary, by article 8, section 9, it is expressly made the duty of the legislature to regulate and restrict the power of incorporated cities and villages, in loaning their credit, contracting debts and borrowing money, so as to prevent abuses in assessments, and in contracting debts by such municipal corporations.

If in the absence of all restriction, express authority were needed, which cannot be pretended, the whole subject is directly committed to the supervision and control of the legislature. How far their powers shall be restricted in this respect, and to what extent they may exercise such powers, without abuse, is necessarily matter of legislative judgment and discretion, exclusively. It is a question with which courts have nothing to do. It pertains in no respect to the judicial functions. If the legislature having the power, expressly grants the authority, courts cannot declare the authority, or its exercise, an abuse, without the assumption of authority which, not only naturally belongs to the law-making power, but the exercise of which is expressly enjoined by the constitution upon the legislature, as a duty. With this plain provision of the constitution before us, directly upon the subject, it is idle to attempt by inference and argument drawn from other provisions, to prove a want of power in the legisla-

ture to confer this authority upon the common council. It is greatly to be feared that there is a growing disposition in our courts to control the legislative department of the government, and to weaken and curtail its authority, by loose, overstrained and doubtful interpretations of the fundamental law. Upon this question of power in the legislature, I agree fully with the court in the third judicial district, in the case of *Grant* v. *Courter*, recently decided.

I find, however, an insuperable difficulty in sustaining the authority of the common council, to borrow the money, and bind the city, by the issue of the bonds in question, upon another ground. And that is, that the legislature never exercised the power it possessed, in such a manner as to enact a valid law, but merely proposed one, which was submitted to the electors, to pass or reject as they might deem expedient and proper. In this respect the case falls directly and inevitably, as it seems to me, within the decision of the court of appeals in *Barto* v. *Himrod*, (4 *Selden*, 483.) If any principle is established by that decision it is this, that a statute, in form, enacted by the legislature, but which by its own provisions is not to take effect and become operative as a law until it shall have been submitted to the electors for their approval or rejection, and only in the event of its receiving a favorable vote from them, is unconstitutional and void. It proceeds upon the ground, as will be seen by referring to the opinions delivered, that in such a case the legislature does not exercise its law-making sovereignty, but attempts to delegate it to the electors, to be exercised by them.

That the sections of the amended city charter (*Sess. Laws of 1851, ch.* 389) purporting to give this power to the common council, are in direct contravention of this principle, cannot, as it seems to me, be doubtful. It is expressly provided by section 291, that the preceding sections, 285, 286, 287, 288, 289, 290, together with 291, " shall not take effect until they shall have been submitted to the electors of the city of Rochester, qualified to vote for charter officers of said city, at a special election, which shall be held in said city at such time as the common council shall direct, of which ten days' previous notice shall be

given by advertisement to be inserted in all the daily newspapers published in said city, for the purpose of determining whether or not it is expedient for said city to borrow the money mentioned in said sections, for the purposes therein specified." The form of the ballots is there prescribed; "for the rail road," and "against the rail road." And it is provided that those ballots on which shall be written or printed the words "for the rail road," shall be deemed to approve said sections, and those "against the rail road," shall be deemed as not approving them. The votes were to be canvassed by the inspectors of election in the several wards, and the result certified and returned to the clerk of the common council. The return was to contain the aggregate number of votes, and to designate how many were for the rail road, and how many against the rail road. The mayor and clerk of the common council were then to canvass the votes thus certified and returned, and make and file in the office of said clerk their certificate that the said sections were approved or were not approved, as the case might be, by the votes of two thirds of the electors voting at said election. Section 292 further provides, that if the said sections should be approved by two-thirds of the votes of the electors voting at such election, they should take effect immediately after the filing of the certificate. The amended charter, of which these sections were in form a part, by the 293d section took effect immediately. But the sections in question which contained no part of the ordinary powers of the common council, but were designed to confer an extraordinary power upon this particular subject, did not, by the express terms of the enactment, take effect immediately, and whether they should ever take effect was made to depend entirely upon the contingency of their receiving the favorable vote of two-thirds of the electors voting, and the making and filing of the certificate that they had been approved, by the mayor and clerk. If no election had been held, or if when held the vote had been one of disapproval, the sections would never have taken effect, but remained without force or authority, the same as though they had never been enacted in form. This was the precise difficulty with the free school law. By its own terms it could

never have the force or authority of law, until it had received the assent of a majority of the votes of the voters at an election. So here it was the sections themselves which were submitted for approval or disapproval, and it was a favorable vote alone which could give them any vitality or force. The limitation was directly upon the grant of power, and not upon its exercise after the grant had taken effect, and vested the power in the common council. The vote determined whether there should or should not be any grant. And it was in reference to this precise condition of the provisions of a statute emanating from the legislature that the court of appeals said, in the case above cited: "They were not law or to become law until they had received a majority of the votes of the people at a general election in their favor, nor unless they received such majority. It results therefore, unavoidably, from the terms of the act itself, that it was the popular vote which made the law. The legislature prepared the plan or project and submitted it to the people, to be passed or rejected. The legislature had no power to make such submission, nor had the people any power to bind each other by acting upon it." And Chief Justice Ruggles, in his opinion, even goes so far as to say, that if the act had by its terms been declared to be law from the time of its passage, to take effect in case it should receive a majority of votes in its favor, it would nevertheless have been invalid, because such vote would have involved the expediency of the law, and is not such an event as a statute can be made to take effect upon according to the meaning and intent of the constitution. "It is not denied," says the learned chief justice, "that a valid statute may be passed to take effect upon the happening of some event certain or uncertain. But such a statute, when it comes from the hands of the legislature, must be law *in presenti* to take effect *in futuro*." It is argued that these sections so far took effect, when they came from the hands of the legislature, as to be in some sense law *in presenti*. But this I apprehend cannot be so. When the legislature said they *should not* take effect except in a certain contingency, and should take effect when that happened, they said the sections should not be a law unless the

Clarke *v.* City of Rochester.

event happened. Until then it was no rule for the government of any one. No one could violate it, nor acquire any rights, or exercise any authority under it. It vested no power to be exercised, and no one could do any valid, or binding act, under it. How then can it be deemed a law in any sense ? A law is 'a rule of conduct, imposing duties and obligations upon the citizen, which is capable of being violated, and under which he may acquire and enjoy rights. Suppose this same provision had applied to the whole amended charter, would it have been law, until the election had been held, and the certificate of a vote of approval filed ? Clearly not. The old charter would have remained in full force and been the sole and exclusive law of the corporation until the happening of that event. Indeed a statute passed to take effect at a future day, is not law *in presenti,* in any just sense in which the term law can be used. It is an enactment which is to become law at the day appointed, but in which all vitality is suspended, or rather from which it is withheld, by the power which created it, until the appointed time.

Every lawyer understands that a statute passed by the legislature, in which no time is prescribed, does not commence, or take effect as a law, in any part of the state, until the twentieth day after it comes from the hands of the legislature. This is regulated by a general provision of law, to which all enactments, not specially provided for, are subject. (1 *R. S.* 144, § 12.) It is no law for any purpose, or in any conceivable sense, until the twenty days have elapsed. To say therefore of a statute that it is law *in presenti* to take effect *in futuro,* is simply saying that it is law now, to become law hereafter, which is a solecism, and a proposition which destroys itself.

It is urged that laws passed for the government of the inhabitants of a village or city, stand upon a different footing from those passed for the government of the whole people of the state ; and that a submission to the electors, which would render a general law void and of no effect, would not affect injuriously, a local law. But I am unable to see any ground on which such a distinction can possibly rest. It is simply a question of power in the legislature, under the constitution. No

one pretends that the constitution has, by any terms, prohibited it in the one case, and allowed it in the other. The power of the legislature is manifestly the same in both cases. If it has no power under the constitution, to submit a law for approval or disapproval to the electors in the one case, it has not in the other; and if the electors have no power to bind each other, by acting upon the submission in the one case, they have not in the other. The legislative power of the state is vested in the senate and assembly for the purpose of enacting local, as well as general laws, and must be exercised in the same manner in either case, and any thing in form or substance which would avoid one, would the other, in all cases where the constitution has not prescribed a different rule. The power must be exercised as fully and completely in a statute relating to the construction of a rail road by a corporation, as in one relating to common schools and general education.

But for this decision of the court of last resort, in *Barto* v. *Himrod,* I should have no doubt that it was not only perfectly competent for the legislature to pass a valid law in this form, but that it was highly expedient and proper in that body, to consult the electors on a question like this, before delivering them over bound, to the common council. The constitution, (*art.* 7, § 12,) expressly declares that no statute, creating a debt against the state shall take effect until it shall, at a general election, have been submitted to the people and received a majority of all the votes cast for and against it at such election. And the court in the case referred to, seem to have held that the constitution, by requiring a submission in a given case, had impliedly forbidden it in all others. But with all possible respect for that court and the learned judges who delivered the opinions, it seems to me that the maxim *expressio unius est exclusio alterius,* is not at all applicable to the provisions of a constitution restricting the exercise of a sovereign power. Indeed it has always appeared to my mind, that that provision of the constitution had just the contrary effect. It is plainly a limitation upon the legislative power upon a given subject, and nothing more. It is clearly not legislative power

Clarke *v.* City of Rochester.

reserved to the electors, any more than the executive right to sanction or negative, is legislative power conferred upon the governor. In either case, it is simply a check or limitation upon legislative power otherwise fully granted. All the legislative power of the state is vested in the two bodies which compose the legislature. None of it is reserved to the people to be exercised, and none is vested in the governor. A check or limitation upon a given power, is quite a different thing from the power itself, not only in its nature, but in its exercise. And when we consider that before the adoption of the present constitution, the legislature had repeatedly passed laws in this same form, and that the constitution, so far from forbidding the practice enjoined it as an imperative duty in a single case, the just inference would seem to be, that it was rather designed to leave the legislature to exercise the same power in all other cases, at its discretion. It is quite certain that the constitution nowhere forbids the passage of laws, by the legislature, to take effect only upon receiving the approbation of a majority of the electors upon whom they are to operate, in the form of a ballot deposited at an election, unless it is in the provision making such a submission imperative in a particular case. Indeed, such a prohibition would be in singular contrast with the whole spirit and theory of our government. The consent and sanction of the governed, has heretofore been supposed to add force and validity to statutes, instead of rendering them null and void.

I have bestowed no inconsiderable reflection upon this subject, since this novel theory was first broached, that the submission of a statute, enacted in due form by the legislature, to the people for acceptance or rejection in some prescribed form, rendered it a nullity. Without being able to comprehend, clearly, the principles upon which it has been held to rest, I have not been able to see at all, why it is that the law-making body, in the absence of all constitutional restrictions, may not, in the plenitude of its sovereignty, properly exercise its power, subject to such checks and limitations as it may see fit to impose. And this is virtually conceded when it is admitted that a valid

Clarke v. City of Rochester.

law may be passed to take effect upon the happening of a future contingent event. The legislative sovereignty is just as fully and completely exercised by an enactment in that form as in any other. It is of the very nature and essence of sovereignty to exercise its powers absolutely or conditionally as it may choose. It may enact absolutely, and bind the elector, even against his will, and in known and intentional hostility to it; or in accordance with his wishes, and subject to his approval and acceptance. It is by no means essential to the full and proper exercise of sovereign power, that it should be exercised in opposition to the will of the governed. The sovereignty is quite as fully, and indeed more strikingly manifested, when exercised in accordance with the elector's will, and subject to his approval or acceptance. The requirement of the approval or assent of the elector, as the condition of an enactment's taking effect and becoming operative as a law, is no delegation of legislative power to the electors, as seems to have been supposed. And the elector's act of approval by his vote, has not the quality of, nor does it purport to be, an act of sovereignty. It is an act simply of assent or obedience, and serves only to remove the check or limitation to the full and free operation of the supreme will. It operates as a secondary means, simply, devised and employed by the sovereign to express his own will, and render it absolute. And it is the sovereign will, embodied in the enactment, and not the secondary act of approval by the elector, which makes the law, in such a case. For instance, A. and B. enter into a contract which is full and complete in all its parts and provisions, and signed by the parties. But in it they insert a condition or proviso, that it shall not take effect and become binding, until it has been submitted to C. and he shall have indorsed his approval upon it, or his opinion that it is in due form, or not contrary to law. It is no contract until it has C.'s indorsement, and yet C. does not make it, nor is any power delegated to him to bind the parties by contract. It is still the sole act of A. and B., and it is their will which binds, and C. acts only secondarily as an instrument or adviser. And so I conceive that were an act passed by the legisla-

Clarke v. City of Rochester.

ture, with a proviso that it should not take effect and become a law until it had been submitted to the court of appeals, and the requisite number of the judges had concurred in, and filed an opinion that its provisions were not in conflict with any provision of the constitution, the court of appeals by this act would not make the law, nor would any legislative power be delegated to them in such a case. Their act would simply fulfill a condition, and remove a check, and it would still be the legislative will, which had employed these secondary means, that would create and constitute the law. This illustrates, in my judgment, the clear and plain distinction between a check devised and imposed by the supreme will, upon the operation of its own decrees or enactments, and the delegation of sovereign power. And it is by overlooking this distinction, that acts like the one under consideration have been held to be invalid. And whether the condition upon which an enactment is to take effect and become a law be the approval of the act, by a majority of the electors, or the sanction of the court of appeals, or the happening of some uncertain event in future, each and all are of the same nature and character precisely, and operate in the same manner upon the enactment.

The logic of the opposite theory is exceedingly brief. It is substantially this: By the terms of the enactment it is no law without the required assent; therefore, the act of yielding assent creates the law, and operates as the law-making power. This may seem plausible; but it must be seen in the end, I think, to be utterly delusive and unsound. The assent or dissent is a subordinate and not a sovereign act, and in its nature, character and office, is precisely like the executive sanction or negative, which is in no sense the exercise of law-making power. With this difference, however; that in the one case the check on limitation is devised and imposed by the authors of the constitution, the ultimate sovereigns; and in the other, by the law making power, upon its own acts, in the exercise of its unrestrained sovereignty. And so, too, in my judgment, it is no evidence whatever that the legislature did not pass upon the expediency of a statute, or exercise the sovereign judgment in

reference to its expediency, because they ordained that it should not take effect without its receiving the assent of a majority of the electors. I should infer from such an act, that the legislature had not only exercised their own best judgment, upon the question of its expediency, but to make assurance doubly sure, had determined to consult the judgment of the electors, also. The highest possible considerations of the expediency of enacting a particular statute, are often involved in the question of what is the public sentiment in regard to the principle embodied in it. Can it be enforced? The most salutary laws are often rendered in a measure powerless and ineffectual, because opposed to the sentiments or habits of a majority of the governed. And whether the legislator consults the elector beforehand, and enacts an absolute statute, in accordance with the elector's wishes, or not consulting him beforehand, passes the same act, conditioned to take effect upon its receiving the sanction of the electors afterward, it is the same in substance and effect, and in either case it is the legislator and not the elector, who determines in regard to the fitness and expediency of the law. The essential fact in both cases is, that the will of the sovereign acts in harmony with that of the subjects of the law, and the underlying principle is not at all changed by the circumstance that in one case the sovereign adopts the petition, and in the other, makes his enactment effectual on condition only of its receiving the elector's sanction in the form of a ballot. And, to my mind, it is not a little difficult to discover upon what principle it is, either in government or philosophy, that the assent of the subordinate nullifies the accordant will of the superior's power. Upon grounds of policy and expediency, I am certainly opposed to the enactment of laws in this form, on all subjects of ordinary and common legislation. But upon questions of this character, involving large burthens of debt, and consequent taxation, for a long period, it would seem not only just, but politic, that the electors should be consulted, and their assent obtained, before the burthens are irretrievably fastened upon them. To the judicial mind, however, it is simply a question of power, on the part of the legislature, to con-

Clarke *v.* City of Rochester.

fer with the electors, and to annex such conditions precedent to their enactments, as the assent of the electors.   And questions of policy and expediency can in no respect be permitted to affect it.   The court of last resort has said that the legislature had no power to submit a statute to the electors, and that the electors had no power to bind each other by acting upon the submission, within the meaning and intent of the constitution. And whether the constitution really says or means this, or is merely made to mean it, by an unwarrantable rendering of the instrument, the decision is binding upon all other courts while it shall remain unreversed.   I confess that the restriction appears, to my mind, rather a judicial than a constitutional one, but I am not at liberty so to hold, and have no desire to evade the just force and authority of that decision.   If that court were in error, as it is not impossible they may have been, in that decision, it is their province, and not ours, to correct it.

I find myself constrained, therefore, by the rigor of the maxim *stare decisis*, to hold that the sections of the statute in question were never properly enacted by the legislature, and never had any force or authority as law.   And consequently, that the bonds issued under them were void and the action properly brought.   The judgment should therefore be affirmed.

Judgment reversed.

[CAYUGA GENERAL TERM, June 1, 1857.   *Johnson, T. R. Strong, Welles* and *Smith,* Justices ]